Fuld, J.
Acting under the authority of the so-called 1962 Receivership Law (Multiple Dwelling Law, § 309, as amd. by L. 1962, ch. 492), the Department of Buildings of the City of New York, the respondent herein, petitioned for and obtained an order from the Supreme Court designating the Commissioner of Real Estate as receiver of the rents, issues and profits of the premises located at 221 West 21st Street. The Appellate Division unanimously affirmed, and the appellants, the owner and mortgagee of the premises involved, appeal as of right, urging, primarily, that the statute is unconstitutional.
Section 309 of the Multiple Dwelling Law was amended in 1962, as the Legislature itself declared (L. 1962, eh. 492, § 1), to afford “ additional enforcement powers ” (1) to compel the correction of conditions it found existed in deteriorated or deteriorating dwellings which ‘ ‘ may cause irreparable damage * * * or endanger the life, health or safety of [their] occupants, or the occupants of adjacent properties or the general public” and (2) “to increase the supply of adequate, safe and standard dwelling units, the shortage of which constitutes a public emergency and is contrary to the public welfare.”
To effectuate these objectives, the Legislature prescribed a detailed and fairly elaborate procedure. Whenever the Department of Buildings certifies to the existence of a “ nuisance ’ ’ — defined in paragraph a of subdivision 1—which “ constitutes a serious fire hazard or is a serious threat to life, health or safety,” the department may issue a written order to the owner directing removal of the nuisance within the time specified, ordinarily not less than 21 days after service of the order (subd. 1, par. e). If the order is not complied with, the department may apply to the Supreme Court for the appointment of a receiver to remove or remedy the condition and for a lien in favor of the Department of Real Estate to secure repayment of the costs incurred by the receiver in so removing or remedying such condition (subd. 5, par. c, cl. 1). If, after notice to the owner and any mortgagee, the court determines that a nuisance does exist, it shall appoint the New York City Commissioner of Real Estate as receiver of the rents, issues and profits of the property. However, upon application *294 of the owner or mortgagee, the court may permit such applicant (upon certain specified conditions) to perform the work, within the time fixed by the court, in lieu of appointing a receiver and, if the owner or mortgagee fails to complete such work within the time allowed, the receiver shall then be appointed (subd. 5, par. c, cl. 3).
The receiver, expressly vested with “ all of the powers and duties of a receiver appointed in an action to foreclose a mortgage ’ ’, is to proceed ‘ ‘ with all reasonable speed ’ ’ to remove the nuisance ‘ ‘ constituting a serious fire hazard or a serious threat to life, health or safety ’ ’ and apply the rents which he is to collect from the property to the cost of “ removing or remedying such nuisance, to the payment of expenses reasonably necessary to the proper operation and management of the property * * * and to unpaid taxes, assessments ” and other charges (subd. 5, par. d, cl. 1). If the income from the property proves insufficient, the Department of Real Estate shall advance to the receiver—“ from a fund to be known as the multiple dwelling section three hundred nine operating fund ” (subd. 9) — any sums necessary to cover such cost and shall have a lien against the property for the sums so advanced (subd. 5, par. d, cl. 1). This lien, the statute goes on to recite (subd. 4, par. a), “ shall have priority over all other liens and encumbrances except taxes, assessments and mortgages recorded previously to the existence of such lien,” except as otherwise provided in subdivision 5. And that subdivision, in paragraph e, declares that the lien in favor of the department “ shall be subject to any [previously recorded] mortgage or lien * * * and the rights of the holders of such mortgages or liens shall not in any way be impaired by the appointment of a receiver * * * or by the existence of such lien; provided, however, that no such mortgagee or lienor who has been duly served with notice [as prescribed elsewhere in subd. 5] * * * shall be entitled to any of the rents, issues and profits of the property, nor, in any action to foreclose his mortgage or lien, to a discharge of the receiver * * * until the lien of the receiver in favor of the department of real estate shall have been fully paid and satisfied ” (subd. 5, par. e).
The statute further provides that a mortgagee or lienor who at his own expense removes the nuisance shall have a lien *295 “ equivalent ” to the lien granted to the receiver and that a mortgag’ee or lienor who, following the appointment of a receiver, reimburses the receiver and the department for costs and charges incurred shall be entitled to an assignment of the lien granted to the receiver (subd. 5, par. g). The receiver shall be discharged—upon rendering “ a full and complete accounting to the court”—when the nuisance has been removed, the cost of such removal paid from the rents and income of the dwelling and the surplus money, if any, paid over to the owner or mortgagee as the court may direct. In addition, the owner, mortgagee or any other lienor, upon the removal of the nuisance, may apply for the discharge of the receiver upon payment of all sums expended by the receiver which were not paid out of the rents and income of the dwelling (subd. 5, par. d, el. 4).
With this résumé of section 309, we turn to the proceedings which were taken under it by the respondent Department of Buildings.
The premises in question, situated in the Chelsea section of Manhattan, consist of a five-story rent-controlled building containing 10 apartments. On July 10, 1963, the respondent, following the procedure prescribed by the statute, certified that a nuisance existed on the premises,[1] directed its removal and in its order (served on both appellant owner and appellant mortgagee) recited that, if the dangerous conditions were not removed or remedied within 21 days, it would apply for the appointment of a receiver “with rights * * * superior to that of the owner, mortgagees and lienors”. The certificate listed the violations and conditions which constituted the nuisance. When later reinspections showed no change in the situation, the respondent, on September 10, 1963, applied to the Supreme Court for the appointment of a receiver by order to show cause returnable on September 12. The order to show cause contained all of the recitals called for by the statute (subd. 5, par. c, cl. 1). The reason given for the early return date — the order is generally returnable five days after completion of service (subd. 5, par. c, cl. 1)—was the dangerous condition of the premises (subd. 5, par. c, cl. 2). Indeed, on *296 September 9,1963, acting pursuant to provisions of the Administrative Code of the City of New York (§ C26-194.0), the respondent had served the owner with a notice that the building was unsafe and, on the following day, ordered the tenants still on the premises removed because of the danger that the building or a part of it might fall (New York City Administrative Code, § C26-201.0, subd. c).
On September 12, 1963, the return day of the order to show cause, the owner appeared by counsel and the mortgagee (who assertedly holds a mortgage for $20,000 as a nominal mortgagee for others) appeared in person. The court was advised that no one was then living in the building, that a number of the tenants who had been forced to vacate the premises intended to return as soon as the building was rendered safe and that the owmer had started to do the necessary work. In answer to a question put by the court as to the length of time required “to finish this job”, the owner’s attorney replied, “between two and three weeks at the most ”. Instead of adjourning the motion for 30 days, as the owner requested, the court granted the motion for the appointment of a receiver but “ stayed” his appointment until October 15 (a period of 33 days) to give the owner an “opportunity” to eliminate the violations and render the building habitable. The essential repairs not having been completed by that date, the owner was given further time, until November 20, to complete the task. And, when it appeared on this date that considerable work still remained to be done and that a number of serious violations still existed, the court signed the order appointing the receiver.
It is the appellants’ position (1) that the statute is unconstitutional in that it impairs the rights of appellant mortgagee under his prior mortgage contract (U. S. Const., art. I, § 10); (2) that they were denied a proper hearing; and (3) that, in any event, the facts failed to warrant the appointment of a receiver.
The legislation before us was enacted to accomplish the twofold purpose of eliminating intolerable and dangerous housing conditions in multiple dwellings, for the most part in slum areas, and of increasing the supply of safe and adequate housing accommodations. As already noted, in passing the amendatory act, the Legislature expressly found (1) that there existed, *297 in the cities to which its provisions apply, deteriorated or deteriorating dwellings which contain conditions constituting a threat to life, health and safety and (2) that there was a shortage, constituting a public emergency, of habitable dwelling units (L. 1962, ch. 492, § 1).
Confronted with such conditions — and we know from the cases which have been before us over the years that these findings are not without basis — the Legislature was warranted in attempting, by an exercise of its police power, to take remedial steps to promote the public interest in the maintenance of an adequate supply of safe and sanitary housing accommodations. (See People ex rel. Durham Realty Corp. v. La Fetra, 230 N. Y. 429, 442, 445; Adamec v. Post, 273 N. Y. 250; Loab Estates v. Druhe, 300 N. Y. 176; cf. Matter of Emray Realty Corp. v. McGoldrick, 307 N. Y. 772; see, also, People ex rel. Clark v. Gilchrist, 243 N. Y. 173, 185.) In the Loab Estates case, this court upheld, as a valid exercise of the police power, a local law which, because of a housing shortage, denied to an owner of a multiple dwelling ‘‘ the [unlimited] power to withdraw his property from the rental market” (300 N. Y. 176, 180, supra), and legislation has long been sustained in this State and elsewhere, likewise as an exercise of the police power, which either (1) required that such an owner make alterations necessary for the health and safety of his tenants or (2) authorized a municipality, should the owner fail to make the alterations, to demolish the structure or to make the repairs itself and thereafter recover from the owner the expenses thereby incurred. (See, e.g., Health Dept. v. Rector of Trinity Church, 145 N. Y. 32; Adamec v. Post, 273 N. Y. 250, supra; Polsgrove v. Moss, 154 Ky. 408; Richards v. City of Columbia, 227 S. C. 538; City of Houston v. Lurie, 148 Tex. 391.)
If the legislation before us “ is addressed to a legitimate end and the measures taken are reasonable and appropriate to that end”, it may not be stricken as unconstitutional, even though it may interfere with rights established by existing contracts. (Home Bldg. & Loam Assn. v. Blaisdell, 290 U. S. 398, 438.) It is “ fundamental ”, we wrote in the Durham Realty Corp. case (230 N. Y., at p. 442), that “ the state may establish regulations reasonably necessary to secure the general welfare of the community by the exercise of its police power although *298 the rights of private property are [thereby] * * * curtailed and freedom of contract is abridged.” (See, also, Guttag v. Shatzkin, 230 N. Y. 647.) Accordingly, when, as here, housing accommodations are in short supply and multiple dwellings become unfit for use and a source of danger, the State may enact legislation reasonably aimed at correcting the situation and promoting the public welfare, even though the means devised to accomplish that result may impair the obligation of the mortgagee’s contract with his mortgagor.
To this extent, the private interests, embodied in contracts, are made subservient to the interests of the public for whose benefit the State exercises its “ continuing and dominant protective power ”. (Home Bldg. & Loan Assn. v. Blaisdell, 290 U. S. 398, 437, supra.) In other words, “ contracts are made subject to this exercise of the [protective] power of the State when otherwise justified”. (Marcus Brown Co. v. Feldman, 256 U. S. 170, 198; see, also, Home Bldg. & Loan Assn. v. Blaisdell, 290 U. S. 398, 439, supra; Gelfert v. National City Bank, 313 U. S. 221; East New York Bank v. Hahn, 326 U. S. 230, 232.) Whether this protective power of the State be treated as “an implied condition of every contract and, as such, as much part of the contract as though it were written into it ” or as “ ' an exercise of the sovereign right of the Government to protect the . . . general welfare of the people * * * paramount to any rights under contracts between individuals ’ ” (East New York Bank v. Hahn, 326 U. S. 230, 232-233, supra), it is “ ‘ settled law ’ ” that “ ‘ the interdiction of statutes impairing the obligation of contracts does not prevent the State from exercising such powers as * * * are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected.’ ” (Home Bldg. & Loan Assn. v. Blaisdell, 290 U. S. 398, 437, supra; Manigault v. Springs, 199 U. S. 473, 480.)
The appellants seek to overcome the thrust of these principles by pointing to this court’s decision (in 1938) in Central Sav. Bank v. City of New York (279 N. Y. 266, remittitur amd. 280 N. Y. 9, cert. den. 306 U. S. 661).
We had, the year before deciding that case, sustained the constitutionality of a subdivision (numbered subd. 4, par. a) of section 309 of the Multiple Dwelling Law which provided *299 that, if an owner of an old law (pre-1901) tenement house desired to continue the structure as a tenement or multiple dwelling, he was obliged to make those changes in the building found necessary for the public health and welfare and that, if the owner refused to make the alterations, the city was authorized to do so, the cost becoming a lien upon the property subject to taxes, assessments and prior mortgages. (See Adamec v. Post, 273 N. Y. 250, supra.) A year later, as just noted, the court was called upon, in the Central Sav. Bank case (279 N. Y. 266, supra), to consider the effect of a 1937 amendment (to the statute sustained in Adamec) which declared that the cost of the alterations was to be assessed against the property and that the assessment was to be a lien upon the property having [1] ‘ priority over all other liens and encumbrances, including [previously recorded] mortgages ”. In holding that the provision rendered the statute unconstitutional insofar as the mortgagee was concerned, the court stated that his property was “ taken without due process of law * * * and the obligation of his contract with the mortgagor impaired ” (279 N. Y., at p. 275).
The court found the "statute procedurally defective in that the mortgagee was given no opportunity to be heard and could not even question the amount of the lien placed ahead of his mortgage. Compelled to “sit idly by” while the value of his lien was being diminished, the mortgagee, the court took pains to point out, “ is given no opportunity for a hearing and cannot question the reasonableness or the amount of the expense [incurred for repairs]. * * * The result of this procedure is that the [mortgagees] pay for all the improvements and alterations without having been given their day in court or afforded any hearing ” (279 N. Y., at p. 277).
The 1962 amendatory act fully remedied the procedural deficiencies remarked in the Central Sav. Bank case. As tile statute now reads, it provides that the receiver’s lien shall have priority over an existing mortgage only if the mortgagee is given notice of the Buildings Department’s order directing removal of the nuisance as well as notice of the department’s application for the appointment of a receiver. Instead of being relegated to the sidelines, to “ sit idly by”, the mortgagee has an opportunity to participate in the proceedings from beginning *300 to end. More specifically, not only does he have the right to enforce his lien by an action to foreclose his mortgage but he has the opportunity of contesting the department’s charge that a nuisance exists; and, if that issue is found against him, he may either do the required work himself—securing a lien against the rents — or, after the work is performed by the receiver, reimburse the latter for his expenditures and obtain an assignment of his lien. Finally, the mortgagee may, when the receiver renders his account to the court, question the reasonableness of the expenses incurred by him and reflected in his lien.
It is evident, therefore, that the due process objection leveled by the court against the 1937 amendment has been completely obviated by the Legislature in enacting the 1962 law.
It is likewise clear—turning to the second of the constitutional defects noted in the earlier statute—that the Central Sav. Bank decision may not be relied upon to invalidate the 1962 statute on the ground that it effects an unconstitutional impairment of the mortgagee’s contractual rights. We assess the propriety and reasonableness and, by that token, the validity of an exercise of the police power in light of the conditions confronting the Legislature when it acts, and it can hardly be questioned that the situation, in terms of the shortage of safe and adequate dwelling units, which prompted the 1962 amendment (L. 1962, ch. 492, § 1) presented a far more serious emergency than that existing in 1937. (See L. 1946, ch. 274, as amd. by L. 1962, ch. 21, dealing with the housing and rent emergency in New York City.)
Quite apart from this, the impairment wrought by the 1937 statute was far more severe and drastic than that resulting from the 1962 legislation. The priority now provided for is not an absolute priority, as granted by the earlier law, but a limited one. In other words, whereas the former statute created a prior lien in favor of the receiver against the property itself and enabled him, if the moneys expended by the municipality for repairs were not repaid, to foreclose on the property and thereby wipe out the mortgage and destroy the mortgagee’s lien, the 1962 provision gives the receiver a prior right only to the rents of the property. Thus, paragraph e of subdivision 5, after explicitly reciting that the lien of the *301 receiver “ shall be subject to any [previously recorded] mortgage ”, goes on to state that the mortgagee shall not be entitled “to any of the rents” or “to a discharge of the receiver” until the cost of repairs and alterations has been satisfied.
When weighed against the vital public purposes sought to be achieved, the interference with the mortgagee’s rights resulting from the present law may not be said to be so unreasonable or oppressive as to preclude the State’s exercise of its police power. It is worth remarking that, if the mortgagee’s lien may not be subordinated to the extent provided—that is, by postponing his right to collect rents from the property or to effect a discharge of the receiver until the cost incurred by the receiver (on behalf of the municipality) in removing the dangerous conditions has been repaid—the result would be that the State must permit slum conditions to continue unabated or, alternatively, either condemn unsafe buildings and thereby aggravate the acute housing shortage or continue making improvements with, however, only a lien subordinate to previously recorded mortgages. To insist upon the last course not only would result in a gratuitous addition to the security of prior encumbrancers but would undoubtedly render the operation financially impossible.
The measures taken by the Legislature in its 1962 enactment to combat the emergency found to exist may well be the only ones feasible but, whether or not such is the case, there can be no doubt that they are reasonable and appropriate to the end in view. The same public interest which supports the statute when directed against an owner, even though it impinges on his right to deal freely with his property, equally justifies the legislation as a reasonable exercise of the police power insofar as it affects the rights of the mortgagee.
Concluding, as we do, that the statute is constitutional, we turn briefly to the appellants’ further plaints.
As we have already observed, section 309 authorizes the appointment of a receiver only if there exists in the multiple dwelling in question ‘ ‘ a nuisance * * * which constitutes a serious fire hazard or is a serious threat to life, health or safety ”. Although the statute does not in so many words provide for a hearing on that issue, the recitals in subdivision 5 (par. c, cl. 3)—that the court shall grant the application for appoint *302 ment of a receiver only if it “ shall find ” certain facts and that it may, “after determination of the issue”, permit the owner or mortgagee to make the essential repairs instead of appointing a receiver—“import a hearing” at which the owner and mortgagee will have an opportunity to present evidence in opposition to the application. (Cf. Thompson v. Wallin, 301 N. Y. 476, 494.)
In the case before us, examination of the papers on appeal establishes compliance with the statutory requirements.[2] Hearings were held on three separate days, September 12, October 16 and November 20, and there is not the slightest suggestion that the appellants were prevented from cross-examining the witnesses called by the respondent to prove the existence of a nuisance in the building or from calling witnesses of their own and eliciting evidence in opposition to the application. It was only after the three hearings and a lapse of more than two months from the return day of the motion that the court executed the order appointing a receiver.
In point of fact, a reading of the minutes of the first hearing, that of September 12, indicates that the appellants, far from disputing the presence of a nuisance, acquiesced in the respondent’s charge that innumerable dangerous conditions existed on the premises warranting the appointment of a receiver. In short, it was assumed by all that the building was in an exceedingly hazardous state and that the owner should be given an opportunity to remedy the situation. The only question argued and considered was whether the motion should be adjourned for 30 days or whether it should be granted and the appointment of a receiver stayed for such a period. The court decided on the latter procedure; it granted the motion but put off appointment of a receiver for more than 30 days in order to give the owner a chance to eliminate the dangerous conditions and *303 thereby render the appointment unnecessary. However, when it appeared on November 20, to which date the proceeding had been further adjourned from October 16, that those conditions had not been completely removed and that considerable work still remained to be done — and, certainly, there was basis in the record for such a finding—the court, following the command of the statute (subd. 5, par. c, cl. 3), signed the order appointing the Commissioner of Real Estate as receiver.
Before drawing this opinion to a close, it may not be inappropriate to note, particularly in view of certain objections voiced by the appellants, that the statute allows them to terminate the receivership, once the nuisance has been eliminated, by reimbursing the receiver (or the Department of Real Estate) for the cost of ridding the property of such nuisance and that, if the removal of the dangerous conditions constituting the nuisance is disputed, the appellants are free to apply to the Supreme Court for a determination of that issue.
In sum, then, since section 309 of the Multiple Dwelling Law, prompted by the existence of an emergency of truly awesome proportions, is directed to a legitimate objective and the measures taken are reasonably and appropriately adapted to attain that objective, it is to be upheld as constitutional, as a valid exercise of the police power, and since, in the present case, there was no departure from the statute’s requirements, the order appealed from should be affirmed, with costs.

. The certificate was based upon findings by three inspectors who had visited the building five times from May 1 to June 19, 1963, and had found more than 100 violations of the Multiple Dwelling Law, the Multiple Dwelling Code and the Administrative Code.

. The building had been vacated on order of the Department of Buildings two days before the application for the appointment of a receiver was heard because of a fear that the building might collapse and endanger the occupants — who, planning to return when the building was rendered safe and habitable, retained their status as tenants (cf. Matter of Austreal Corp. v. McGoldrick, 305 N. Y. 848; also, Temporary State Housing Rent Commission, Operational Bulletin, No. 39, dated Nov. 9, 1960)—but, contrary to intimations by the appellants, that circumstance neither removed the ease from the coverage of the statute nor deprived the court of jurisdiction to appoint a receiver.