In the Matter of LESLIE KAYE et al., on Behalf of Themselves and All Others Similarly Situated, Respondents, v ROBERT P. WHALEN, as Commissioner of Health, et al., Appellants.

Third Department, February 14, 1977

*Louis J. Lefkowitz, Attorney-General (Arthur Patane, Ruth Kessler Toch* and *Kenneth J. Connolly* of counsel), for appellants.

*O'Connell & Aronowitz, P. C. (Cornelius D. Murray* and *Lewis A. Aronowitz* of counsel), for respondents.

MAHONEY, J. The Medicaid Program (subchapter XIX of the Social Security Act, US Code, tit 42, § 1396 *et seq.)* makes available funds, to be supplemented by State contributions, to pay for the medical care of those whose means fall below certain financial standards. The Federal funds are available to those States which submit a plan for administering the funds acceptable to the Secretary of Health, Education and Welfare (US Code, tit 42, § 1396). The statute imposes myriad requirements as to what constitutes an acceptable plan (US Code, tit 42, § 1396a), but does not purport to set the specific rates at which those providing the medical services are to be reimbursed. That duty is left, within the confines of the requirements of section 1396a, to the States.

The New York State Legislature charges the respondent Commissioner of Health with the responsibility of setting the rate at which the petitioners, nursing home owners, are

reimbursed for the care they provide Medicaid beneficiaries. Until August, 1975 the statutory standard by which the commissioner was directed to set rates was subdivision 3 of section 2807 of the Public Health Law, which required that the rates be "reasonably related to the costs of efficient production of such service." The subdivision goes on to impose a few specific standards, such as requiring the commissioner to consider "geographical differentials in the elements of cost" and to "exclude costs for research." Subdivision 4 of section 2807 (L 1974, ch 682, § 1) directs the commissioner to notify each nursing home of new rates 60 days before the fiscal year for which the rates are to be effective.

The commissioner promulgated regulations, as he was required to do (Public Health Law, § 2803, subd 2, par [b]), stating in detail the criteria by which he would set the reimbursement rates (10 NYCRR Part 86). The regulations also specified that the rates would be set for calendar year periods (10 NYCRR 86-1.10). Thus, it appears from both the regulations (10 NYCRR 86-1.10) and the statute (Public Health Law, § 2807, subd 4) that new rates would be established before November 1 each year, to become effective the following January 1 and remain in effect for one year.

This case concerns the legality of two actions by the commissioner. In November, 1975 he adopted as tentative rates for 1976 the 1975 reimbursement rates, rather than generating new rates based on the criteria set forth in the then-existing department regulations. In October, 1976 he established new rates and made them retroactive to January 1, 1976, thereby supplanting the tentative rates set the previous November. Petitioners, nursing home owners, brought this article 78 proceeding in February, 1976 to invalidate the tentative rates of November, 1975 and to force the commissioner to set 1976 rates consistent with his 1975 regulations. In September, 1976 Special Term granted the requested relief and further enjoined the commissioner from changing his method of computing rates without first securing the approval of the United States Department of Health, Education and Welfare. Although the commissioner's rate-setting action of October, 1976 occurred after Special Term's judgment, the substance of the post-judgment rate-setting is not disputed and may be considered here without the need to remand. We accept the truth of petitioners' uncontested allegation that both the November, 1975 and October, 1976 rates for 1976 are

generally lower than the 1976 rates would have been had they been set in keeping with the regulations.

Petitioners' first ground for relief is that in each instance the commissioner acted without statutory authorization. With respect to the November, 1975 tentative rates, it is true that the then-existing regulations stated criteria, established under the standards of subdivision 3 of section 2807 of the Public Health Law whereby rates would be set for each new calendar year. Absent further legislative action before January 1, 1976, perhaps it would be fair to conclude that the commissioner was bound either to promulgate new regulations in the manner required by law (see NY Const, art IV, § 8; Executive Law, §§ 102, 103, 105) or to mechanically generate new rates conforming to the extant regulations. (But, see, State Administrative Procedure Act, § 202, subd 1, par [d] [eff Sept. 1, 1976].)*

However, further legislative action had been taken, with the addition of section 2808 (L 1975, ch 649, § 7, and ch 650, § 2, eff Aug. 6, 1975), which provided, *inter alia,* that:

"1. a. The Commissioner shall promulgate interim regulations to expire no later than the thirty-first day of December, nineteen hundred seventy-six, that will relate the rate of payment for each residential health care facility to the operation and program management of the facility, as well as to the quality of patient care provided by the facility. Such regulations shall be consistent with regulations promulgated under the provisions of title eighteen of the federal social security act, by which payment for costs incurred by a residential health care facility for a quantity and quality of supplies or services necessary for the proper operation of a residential health care facility *shall not exceed those which would be paid in the normal course of business by a prudent buyer of such supplies or services."* (Emphasis supplied.) Paragraph b of subdivision 1 goes on to direct promulgation of interim regulations regarding real property costs. Subdivision 2 mandates that certain costs, such as political or lobbying pay-

---

* Section 202 (subd 1, par [d]) of the State Administrative Procedure Act makes explicit after September 1, 1976 what previously may have been implicit in the nature of the function of administrative agencies, to wit "if the agency finds that immediate adoption * * * or repeal of a rule is necessary for * * * the public health, safety or general welfare, and that observance of the requirements of notice and public hearing would be contrary to the public interest, the agency may dispense with all or part of such requirements and adopt the rule * * * or repeal as an emergency measure".

ments, certain types of advertising expenses, and fines should not be added in to determine 1976 rates.

Although certain aspects of section 2808, such as the provision disallowing consideration of fines paid, may have been implicitly part of the pre-existing statutory standards of subdivision 3 of section 2807 (under which the regulations existing in 1975 were promulgated), there were certainly some significant changes made by section 2808. The controlling standard for rate determination in subdivision 3 of section 2807 was that rates be "reasonably related to the costs of efficient production of such service." The general standard added August 6, 1975 by section 2808, as noted above, was that rates "shall not exceed those which would be paid in the normal course of business by a prudent buyer of such supplies or service." Moreover, section 2808 incorported new, detailed standards via regulations under the Federal Social Security Act.

For the commissioner to ignore the new standards of section 2808 by simply generating new rates through his old regulations would have been clearly in conflict with the Legislature's will. Surely, the Legislature cannot be encumbered, absent constitutional constraints, by the administrative delays involved in promulgating new regulations. The purpose of regulations is to carry out statutory directives. It is true section 2808 required promulgation of interim regulations, but apparently the commissioner had insufficient time between August 6 and November 1, 1975 to do so. It was better to carry out the substantive standards of section 2808 by tentatively continuing (without interim regulations) the 1975 rate, believing it to closely approximate the rate mandated by section 2808, than to set a new rate on the basis of regulations promulgated under a statutory standard (§ 2807, subd 3) no longer in effect. Petitioners have not even attempted to prove that the interim rate set in 1975 was inconsistent with the standard of section 2808.

In any event, the commissioner's November, 1975 action was mooted by the 1976 rates set on October 22, 1976. These rates, set pursuant to new regulations published contemporaneously with the new rates, are retroactive to January 1, 1976 and therefore will fully supplant the tentative rates. Retroactive application to January 1, 1976 of rates set pursuant to section 2808 (rather than the more generous standard of section 2807, subd 3) was explicitly authorized by the addition

of paragraph (e) of subdivision 2 of section 2807: "During the period beginning January first, nineteen hundred seventy-six, and ending March thirty-first, nineteen hundred seventy-seven, the commissioner may determine and certify to the director of the budget rates of payment for residential health care facilities without regard to the provisions of subdivision three of this section. The commissioner is directed to formulate such rates in accordance with the provisions of paragraph c of subdivision one of section twenty-eight hundred three and section twenty-eight hundred eight of this chapter which rates shall be effective for the period hereinbefore specified in this paragraph". (L 1976, ch 76, § 11 [enacted March 30, 1976].) Petitioners contend that no retroactive application was intended since section 18 of chapter 76 of the Laws of 1976 stated "[t]his act shall apply to care, services and supplies furnished on and after the applicable effective date." This presents no ambiguity since section 18 sets several different effective dates for different portions of chapter 76 and states that section 11 (i.e., the portion adding section 2807, subd 2, par [e]) "shall be deemed to have been in full force and effect on and after the first day of January, nineteen hundred seventy-six."

Aside from any question of statutory authorization, petitioners contend the commissioner's actions impaired contractual rights. The only contract they claim rights under is the form agreement between each of them and the State, entitled "New York State Department of Social Services Medicaid Provider Agreement (Full Compliance)". By the terms of this agreement the particular nursing home is certified for 12 months as in full compliance with the Federal standards for a "Skilled Nursing Home" (45 CFR, Part 249) and "in consideration of receiving payments for services provided to individuals receiving assistance under the New York State Plan * * * pursuant to [Medicaid] hereby agrees" to keep certain records and to "not discriminate as to source of payment in admission and retention of patients".

Petitioners argue that this agreement incorporates all details of the New York State Plan which, in order to obtain Federal Medicaid funds, was submitted for HEW approval. Since that plan included the commissioner's 1975 regulations for generating reimbursement rates, there is an implicit promise by the State to the various participating nursing homes that payment would be made at rates consistent with those

regulations. This interpretation does not follow from the contract language. The reference to the "New York State Plan" seems intended only to identify exactly which patients the contract covers. Petitioners allege no extrinsic facts which lead to a different construction. Although there may be an implicit promise by the State to retain the reimbursement rate at some minimum level, the contract is insufficiently precise to support petitioners' claim to a rate above that which the statute now authorizes; the statutory standard being an amount not to exceed that "which would be paid in the normal course of business by a prudent buyer of such supplies or services" (Public Health Law, § 2808, subd 1, par a; L 1975, ch 649, § 7). The Supreme Court of Minnesota, on facts very close to those herein, has similarly held a plaintiff nursing home which executed a Federal "provider agreement" had no contractual right to any particular level of payment (*LaCrescent Constant Care Center v State*, 301 Minn 229).

Petitioners next contend that the respondent violated section 1396a (subd [a], par [13], cl [E]) of title 42 of the United States Code in not obtaining prior HEW approval for the new October, 1976 rates and regulations. Section 1396a imposes various requirements on the State plans for administering Medicaid funds. Subdivision (a) (par [13], cl [E]) requires such plans to provide: "effective July 1, 1976, for payment of the skilled nursing facility * * * services provided under the plan on a reasonable cost related basis, as determined in accordance with methods and standards which shall be developed by the State on the basis of cost-finding methods *approved and verified by the Secretary*". (Emphasis supplied.) This statute was the basis for Special Term's order to respondent to continue reimbursement to petitioners at a rate consistent with the 1975 regulation until approval for new rate-making procedures is obtained from HEW.

Assuming petitioners have standing to enforce the approval requirement, the first issue is whether this statute, effective July 1, 1976, applies to a new rate-making procedure implemented in October, 1976 to be retroactive to January 1, 1976. The Department of Health, Education and Welfare promulgated on July 1, 1976 a regulation pursuant to section 1396a (subd [a], par [13], cl [E]) which exactly repeats the statutory language quoted above (45 CFR 250.30 [a] [3], added by 41 Fed Reg 27305 [1976]). Respondent commissioner has appended to his brief a letter dated September 30, 1976 from the Associate

Regional Commissioner of Health, Education and Welfare responding to a question posed by the New York Department of Social Services as to whether "there are any restrictions in terms of statutory or regulatory requirements to New York adopting a revised rate for [Nursing Homes] on a retroactive basis." The Associate Commissioner answered, *inter alia,* that

"Prior to the publication of the July 1, 1976 regulation, there was no specific methodology of reimbursement required for [Nursing Homes] in the [Medicaid] State plan. The regulations * * * provided that the State established *[sic]* schedules of charges which were consistent with the intent that upper limits did not exceed amounts paid under Title XVIII for similar services. * * *

"[Our] regulations have not previously required HEW approval of the reimbursement methodology developed by the States for [Nursing Homes] * * *. Therefore, revisions to rates for periods prior to the implementation of 250.30 [a][3], [December 31, 1976] are not contrary to Federal regulations insofar as they meet the test of not exceeding amounts paid under Title XVIII."

He further stated that under the July 1, 1976 regulation (45 CFR 250.30 [a] [3]), which implements the statutory provision (§ 1396a, subd [a], par [13], cl [E]) upon which petitioners rely, the "[a]pproval of cost-finding methods takes place when State Plan amendments are submitted. The [revisions] to the [Medicaid] State Plan are due in the Regional Office by December 31, 1976." Petitioners refer to this letter in their brief and do not challenge the propriety of this court's consideration of it.

The letter indicates that the HEW mechanism for approving changes in rate-making procedures was established by HEW to consider only changes effective after January 1, 1977. Therefore, it was not possible for the respondent commissioner to obtain approval for the October, 1976 rates. Although section 1396a (subd [a], par [13], cl [E]) on its face was to be effective July 1, 1976, it is impossible for this court to find that HEW, in waiting until January 1, 1977 to fully implement the approval mechanism, violated the statutory directive. This record contains no evidence of the exigencies faced by HEW in administering the Medicaid plans of the several States.

Furthermore, even if a Federal approval mechanism had been available, the respondent's failure to obtain approval for his October, 1976 rates would not justify the relief requested.

Petitioners have not shown the October rates violate the substantive standard of section 1396a (subd [a], par [13], cl [E]), which merely requires reimbursement rates to be set "on a reasonable cost related basis."

Finally, petitioners claim vested rights in the moneys they have actually received during 1976 under the tentative rates set in November, 1975. They urge that this court's decision in *Matter of White Plains Nursing Home v Whalen* (53 AD2d 926) precludes the respondent from recouping the difference between the tentative rates and the October, 1976 rates he proposes to make retroactive to January 1, 1976.

Petitioners here were notified by November 1, 1975 of their individual tentative rates and that final 1976 rates reflecting "upward or downward revision will be promulgated as soon as possible" (Dept. of Health Mem., 75-159). In the *Matter of White Plains Nursing Home* case the commissioner had set a reimbursement rate for 1975 for the petitioner White Plains Nursing Home with no indication that the rate was subject to change during 1975. We held that since petitioner White Plains Nursing Home performed services in reliance on the apparently final 1975 rate, it had a property right in such rate which the commissioner could not impair without a hearing.

No such reasonable reliance was possible by petitioners herein. They were free to refuse Medicaid patients if the reimbursement rate was below the fee they demanded from the public generally. The petitioners cite no statute requiring them to accept patients at the Medicaid rate, and the only regulation which arguably imposes such an obligation is 10 NYCRR 730.2 (l) "[the operator shall] not discriminate because of race, color, blindness or *sponsorship* in admission, retention and care of patients." (Emphasis supplied.) There is nothing in this language which would preclude a nursing home from excluding any prospective patient who does not pay the established fee charged all patients. Neither does anything in the provider agreement referred to earlier, nor the general arrangement between the State and petitioners, imply such an obligation (cf. *Matter of Sigety v Ingraham,* 29 NY2d 110, 115).

Since the petition will be dismissed, it is not necessary to decide if class relief, granted by Special Term, would have been appropriate.

The judgment should be reversed, on the law and the facts, and the petition dismissed, without costs. Upon service of a

copy of the order to be entered hereon together with notice of entry, the preliminary injunction heretofore granted by order of this court, entered November 19, 1976, should be vacated.

KANE, J. P. (dissenting). Although diplomatically called the establishment of a "tentative" rate by the majority, in plain words and fact the respondents simply froze 1976 Medicaid reimbursement rates at existing 1975 levels. This the majority says they were permitted to do by section 2808 of the Public Health Law. We disagree. It also concludes that chapter 76 of the Laws of 1976 authorized their later action in fixing new rates for 1976 retroactively and that such action neither impaired any contractual rights nor offended relevant Federal statutes and regulations. Again we disagree. The judgment of Special Term should be affirmed with certain modifications.

We believe that this proceeding was properly maintained pursuant to CPLR article 78. Petitioners' basic complaint is that respondents failed to perform their statutory duties and, in fact, exceeded their authority. While a determination fixing rates is involved, the petition does not ask for certiorari review of a matter ordinarily deemed a legislative act; it seeks redress in the classic nature of prohibition and mandamus to restrain an allegedly unauthorized activity and to compel compliance with those duties. In any event, we would not hesitate to treat the present litigation as an action for declaratory judgment (cf. *Matter of Lakeland Water Dist. v Onondaga County Water Auth.,* 24 NY2d 400; *Matter of White Plains Nursing Home v Whalen,* 53 AD2d 926; *Matter of Severino v Ingraham,* 45 AD2d 564). However, petitioners did not obtain an order allowing them to maintain this proceeding as a class action (CPLR 902). Since governmental operations are involved and subsequent petitioners would be adequately protected under the principles of *stare decisis,* the judgment of Special Term should be modified by deleting references to class relief *(Matter of Jones v Berman,* 37 NY2d 42, 57).

Turning to the substantive aspects of this proceeding, it should be recalled that petitioners first questioned the lawfulness of the rate freeze in February of 1976. In answer to their petition, it was alleged that section 2808 of the Public Health Law supplanted all or a portion of section 2807 thereof and that certain fiscal considerations and statutory uncertainty made it necessary to approve "interim" rates. An affidavit of the respondent Commissioner of Health expanded on these justifications. The fiscal considerations were said to be the

serious financial plight of the City of New York and its resulting impact on the budget of the State. The supposed statutory uncertainty was founded on the expected passage of a proposed Medicaid revision bill which would have frozen reimbursement rates from January 1, 1976 through March 31, 1977. The former reason undoubtedly supplied motivation to conserve State resources, but it hardly conferred authority on respondents to single out residential health care facilities as a target for effecting such savings. The latter explanation was completely worthless. In addition to the fact that the Legislature did not bring their prediction into reality, respondents were obviously not entitled to anticipate future legislation but were bound to follow the statutes then in existence until they were changed.

In apparent recognition of the inherent weakness of these arguments, the majority seizes upon respondents' reference to section 2808 of the Public Health Law and maintains that it set a new standard for the establishment of Medicaid reimbursement rates which authorized the freeze initially imposed. This will surely come as welcome news to respondents, particularly since they never claimed that statute possessed such a broad effect before Special Term or in their brief and argument in this court. The afore-mentioned affidavit of the Commissioner of Health merely stated that section 2808 "appears to supplant all, or at least a portion of the traditional rate setting provisions of [s]ection 2807" and concluded in a self-serving fashion that "[u]ntil this issue is resolved it would not be prudent to go forward with 1976 reimbursement." If this represents solid reliance on some newly found standard, it is a remarkably timid manner of expressing it. In our view that statute simply directed the promulgation of interim regulations, exactly as it was worded, and the Commissioner of Health apparently so understood it for he did adopt a new regulation pursuant thereto, *before* the rate freeze was imposed, which reaffirmed and continued the effectiveness of his former regulations (see former 10 NYCRR 86.34, eff Oct. 14, 1975). Far from establishing any new standard, section 2808 required only that certain interim regulations be consistent with Federal regulations on the same subject. The standard contained in subdivision 3 of section 2807 was not repealed, as one might expect had the Legislature truly intended section 2808 to take its place, but remained intact and partially survived amendments made by chapter 76 of the Laws of

1976. Furthermore, even if what a "prudent buyer" would pay constitutes some type of standard, we fail to appreciate how it materially differs from the "costs of efficient production" language. Not often in the normal course of business may a careful buyer obtain something for less than the cost of its efficient production; he certainly cannot do so repeatedly for very long.

Finally, nowhere in the record or briefs before us have respondents even suggested that the frozen rates "closely approximated" the rates mandated by section 2808 as stated by the majority. Petitioners have not attempted to prove that the "tentative" rates were inconsistent with section 2808 because, until now, they were never given any reason to believe that statute might have played a part in respondents' decision to freeze those rates. The issue is not whether proper 1976 rates would be higher or lower than those in use during 1975, but whether respondents had authority to act as they did when they did. Nothing contained in section 2808 of the Public Health Law expressly or impliedly empowered respondents to set an interim or temporary rate and, pending the adoption of valid regulations thereunder, they were obliged to follow the statutes and regulations then in effect. Quite plainly they did not do so and, accordingly, we agree with Special Term that the rate freeze was illegal, null and void.

Our disagreement with the second conclusion of the majority stems from the interpretation we place on chapter 76 of the Laws of 1976. As a general rule, statutes are prospectively construed unless a clear legislative expression to the contrary appears (*Matter of Mulligan v Murphy,* 14 NY2d 223; McKinney's Cons Laws of NY, Book 1, Statutes, § 51). The majority finds such an expression in section 18 of that enactment whereby the amendments to subdivision 2 of section 2807 of the Public Health Law were deemed to have been in effect on and after January 1, 1976. However, the same section also provided that "[t]his act shall not be construed to alter, change, affect, impair or defeat any rights, obligations, duties or interests accrued, incurred or conferred prior to the enactment of this act" (L 1976, ch 76, § 18). While residential health care facilities have no property rights in prospective reimbursement rates, it seems clear to us that they do possess an "interest" in receiving payment for services already rendered which would be "affected" by a retroactive application of the challenged legislation. The language of the enactment

is at least ambiguous and, therefore, we would decline to give it retrospective effect.

Assuming, *arguendo,* that petitioners' rates were properly frozen and that the Legislature meant to permit the retroactive application of chapter 76 of the Laws of 1976, two questions must still be resolved; could retroactive application of new rates be constitutionally accomplished without impairing contractual rights and did the particular action of the respondents in October of 1976 avoid the infringement of such rights?

Petitioners would surely not object to a retroactive windfall and the first inquiry poses difficulty only when the retrospective rates are lower than those previously in effect. *La-Crescent Constant Care Center v State* (301 Minn 229) supplies no answer when this occurs for there the petitioner was contending that its provider agreement had incorporated the State Plan and associated statutory standard so that it had an affirmative contractual right to a rate of reimbursement higher than was then being paid. No element of retroactivity was involved in that case. Here, however, petitioners are asserting that their provider agreements contain sufficient terms to serve as a defensive shield to a later reduction in those reimbursement rates and we agree. Residential health care facilities must execute provider agreements with the State as a precondition to participation in the Medicaid program (see US Code, tit 42, § 1396a, subd [a], par [27]) and, having done so, the fact that no specific payment rates are set forth does not mean that a contractual accord with the State has not been achieved. Mention of the State Plan is obviously a shorthand device used to signify the contractual arrangement chosen by the parties for determining the method and amount of payment to be made for services rendered. We do not wish to imply that a provider agreement may never be altered through some prospective change in the State Plan, but no matter how the Legislature might validly suspend or change the obligations thereby created (see *Home Bldg. & Loan Assn. v Blaisdell,* 290 US 398; *Matter of Department of Bldgs. of City of N.Y. [Philco Realty Corp.],* 14 NY2d 291), it could not have intended nor would it have been constitutionally permissible to abrogate them retroactively (see *Flushing Nat. Bank v Municipal Assistance Corp. for City of N.Y.,* 40 NY2d 731; *Patterson v Carey,* 52 AD2d 171).

The answer to the second question is somewhat complicated

by the fact that respondents have conceded on this appeal that their action in October of 1976 will produce a reimbursement rate which is higher for some residential health care facilities than the initially frozen rate while for others it will be even lower. Its effect on these petitioners has not been developed in this record. Nevertheless, in our opinion petitioners' new 1976 rates may not be retroactively applied, following the foregoing analysis, if they are lower than the originally frozen rates. Parenthetically, this would also hold true if their new rates are lower than rates recalculated according to the statutes and regulations in effect on November 1, 1975, but we are still assuming that the primary freeze was valid and that chapter 76 of the Laws of 1976 was intended to be retroactively applied.

The majority discovers no necessity for petitioners to accept Medicaid patients and reasons that respondents' notification that the tentative reimbursement rates might be adjusted downward eliminated the need to accord them a hearing before recouping any difference between their frozen rates and the new rates. Although we do not think it necessary to presently decide whether residential health care facilities must accept Medicaid patients, these petitioners have alleged that they are required to do so and respondents have "admitted" that in their answer. The parties have thus foreclosed review of that issue in this proceeding and, for whatever their legal worth, 10 NYCRR 730.2 and the language of the provider agreements tend to support their stipulation. In any event, we are not actually concerned with whether the proposed recoupment works a deprivation of property (cf. *Matter of Sigety v Ingraham,* 29 NY2d 110, 115), but whether it causes an impairment of contractual obligations. That it would most certainly do and no description of the original rate as being "tentative" or a subsequent hearing could cure that infirmity. Of course, absent the instant stipulation and provider agreements we would then face the situation addressed by the majority. If that were the case, we still fail to perceive how vested property rights in the form of payments made for services already rendered can be made to disappear according to the label applied to those payments in the first instance *(Matter of White Plains Nursing Home v Whalen,* 53 AD2d 926, *supra).*

Lastly, our views obviate the necessity of considering the entire scope of petitioners' claim that the reimbursement

freeze and retroactive application of new rates conflicts with certain Federal statutes and regulations (see US Code, tit 42, § 1396a, subd [a], par [13], cl [E] and CFR 250.30 [a] [3]). Special Term properly decided this proceeding on the basis of New York law and adequately protected petitioners by directing the recomputation of 1976 rates. The additional injunctive relief granted was unnecessary and its judgment should be further modified accordingly. However, were it not for our declaration concerning the impermissibility of applying chapter 76 of the Laws of 1976 retroactively, we would be inclined to agree with petitioners on this point (see *Hospital Assn. of N. Y. State v Toia,* 428 F Supp 848; *Catholic Med. Center v Rockefeller,* 305 F Supp 1268, affd 430 F2d 1297, app dsmd 400 US 931). The opposite interpretation placed upon the HEW *regulation* by an administrator is not impressive when the *statute* seems to require his superior's approval and verification of cost-finding methods after July 1, 1976.

To recapitulate our position, although class action and injunctive relief were either unwarranted or unnecessary, respondents undertook the rate freeze without lawful authority. They should recalculate those rates in accordance with the statutes and regulations in effect on November 1, 1975 and make appropriate payments to petitioners if their recalculated rates prove to be higher than their frozen rates. Chapter 76 of the Laws of 1976 may not be utilized retroactively, but we have no reason to question the propriety or future application of rates established in conformity therewith. If retrospective application of that enactment were legally possible, the rates thereunder for such a period could not be lower than petitioners' recalculated rates and if the recalculation were itself unnecessary, the rates thereunder could not then be lower than those originally frozen.

The judgment of Special Term should be modified as indicated and affirmed.

LARKIN and HERLIHY, JJ., concur with MAHONEY, J.; KANE, J. P., and MAIN, J., dissent and vote to affirm in an opinion by KANE, J. P.

Judgment reversed, on the law and the facts, and petition dismissed, without costs. Upon service of a copy of the order to be entered hereon together with notice of entry, the prelimi-

nary injunction heretofore granted by order of this court, entered November 19, 1976, is vacated.