OPINION OF THE COURT
Helen E. Freedman, J.
The increasing numbers of homeless people and the decreasing availability of decent temporary and permanent housing are issues of great public concern at the present time.[1]
The matters before me specifically concern compliance by the Department of Housing Preservation and Development (HPD) with its own regulations for relocating displaced tenants into appropriate housing, and the validity of a recent change in the definition of what constitutes appropriate housing.
Petitioners in these article 78 proceedings are residents of the Fox Street Emergency Relocation Center, a shelter facility which houses families and individuals who have been forced out of their homes by official orders to vacate, generally after, fires. The shelter is operated by South Bronx Community Housing Corporation,[2] a nonprofit corporation under contract to the city through HPD. Respondent Gleidman is Commissioner of HPD.
The Division of Relocation of HPD has certain responsibilities for the shelter and relocation of persons who are rendered homeless as a result of vacate orders. (New York City Charter, ch 61, § 1800 et seq.; Administrative Code of City of New York, ch 53, § 1160-1.0 et seq.) HPD has promulgated relocation regulations, article 3 of which is at issue here.[3] Pursuant to section 3.02 of these regulations HPD must furnish the relocatee with a copy of the relocation regulations, pay shelter benefits, file an application *540 with the New York City Housing Authority on behalf of the relocatee, and refer the relocatee to three standard apartments. It is the last requirement that forms the basis of petitioners’ actions.
Most of the petitioners are families consisting of either one or two parents and one to three children. All are low income in that they derive support from low-paying employment or public assistance, and all are eligible for legal services. Most are Spanish speaking and require the services of an interpreter. Petitioners’ rights to remain at the shelter have been terminated after hearings conducted by HPD. The ground for termination in each instance was the petitioner’s allegedly unjustified refusal of three “standard” apartments.
Each of the petitioners claims that the apartments shown were entirely unsuitable in that the apartments themselves and the buildings in which they were located were in substantial disrepair, and a threat to their health and safety. Either plumbing was inadequate, ceilings were falling, paint and plaster were seriously defective, or the premises were infested with vermin. In some instances, the apartments were alleged to be unaffordable[4] or already occupied. Some of the same apartments were shown to many of the petitioners.
The regulations governing the relocation and termination of benefits were originally formulated in conjunction with the settlement of Calderon v Gomez (74 Civ 4868, US Dist Ct, SDNY, Motley, J.). Calderon involved a due process challenge to HPD’s relocation procedures for emergency shelter residents. In a stipulation settling and discontinuing the action, filed August 5,1975, the defendants agreed to “promulgate Rules and Regulations of the Department of Relocation Relating to Persons Temporarily Displaced by Vacate Orders” and attached same to the stipulation. Two aspects of those regulations are relevant here.[5] First, they provided that relocation benefits would not be terminated if a relocatee had accepted a referral and *541 the apartment was “not prepared for occupancy.” (Rules & Regs of Dept of Relocation, § III.B.l.b.) “Prepared for occupancy”[6] was defined in the regulations as follows: “Premises are prepared for occupancy when freed of all violations classified as hazardous” (§ II.A.3; emphasis supplied). Second, the regulations provided: “An emergency relocatee’s temporary shelter benefits shall be terminated sixty (60) days after entry into such temporary accommodations, if, within forty-five (45) days after entry into such temporary accommodations, the Department has offered at least three suitable referrals” (§ IIÍ.B; emphasis supplied).
The term “suitable referral” was not defined.[7] There is no reference to violations and the words “standard apartment” are not used.
The regulations were amended in 1979 to provide that relocation benefits could be terminated upon “unjustified refusal of three Standard Apartments or, if the relocatee is to be relocated to a rooming unit, three rooming units which are suitable accommodations.” (HPD Relocation Reg § 3.07 [a], as amd Dec. 12, 1979.) It therefore appears the term “suitable referral” has been defined to mean “standard apartment” or, in the case of a rooming unit, “suitable accommodation.” The new term, standard apartment, is defined, inter alia, as an apartment in a building with “not more than three (3) hazardous violations” (emphasis supplied) and as one having an “absence of vermin infestation, mice, or other pests or a letter from a licensed exterminator” (HPD Relocation Reg, § 3.01 [g]).
Section D26-51.01 (subd [c], par [1]; subd [d]) of the Administrative Code of the City of New York classifies violations as nonhazardous (“A”), hazardous (“B”), and immediately hazardous (“C”). A “B” violation — a hazardous violation — must be corrected within 30 days and the landlord is subject to a fine of $10 per day up to $100. Rats *542 and vermin are usually classified as “B” violations. Some fire hazards, loose walls and ceilings and some safety hazards are “B” violations.[8]
Immediately hazardous violations, classified as “C” violations, must be corrected within 24 hours and carry a fine of $25 per day. Most “C” violations involve either lack of heat or hot water, other serious plumbing defects, falling ceilings, serious fire hazards, gross defects in gas apparatus or other defects that constitute immediate threats to the health and safety of tenants.
The main cause of action in Goodwin, which was commenced in July, 1981, asserts that respondent’s own regulation is consistently violated, in that relocatees’ benefits are terminated for refusal to accept three apartments even though they are not standard, i.e., apartments that are infested with vermin and extremely unsafe, and/or which are unaffordable. Similar complaints of lack of adherence to procedures in terminating benefits to residents of the Fox Street Shelter were made by the named petitioners in Shanks v Gleidman, and other cases (index Nos. 42662-8, 42701, 19706/81, Supreme Ct, NY County). Counsel for petitioners in Shanks, Goodwin and Gonzalez are the same.
In September, 1981, a stipulation was entered into in Shanks et al. in which respondent agreed to adhere to the procedures established in the regulations then in effect and stated, significantly for the decision in this case: “That it is understood that § 3.01(g) of the Regulations requires, inter alia, that for an apartment to be standard it must be located in a building with not more than three (3) hazardous or ‘B’ violations”. Goodwin, which was pending at that time and which raised the same issues, was not included in the Shanks stipulation. Petitioners have informed the court that this exclusion was due to the fact that Goodwin differed from the other actions in that the petition requested class certification.
Simultaneously, without advising counsel in the Shanks cases, and despite the stipulation of understanding quoted above, respondent took steps to change the definition of *543 standard apartment. Thus on September 16,1981, six days before the date of the Shanks stipulation, and with Goodwin still pending, respondent commenced procedures to change the definition of standard apartment so that it would include any apartment in a building with no more than three immediately hazardous, or “C” violations.[9]
Respondent claims that this change merely “clarified” the regulation to reflect HPD’s intent when it originally promulgated the regulations. No explanation is given as to why HPD, the agency responsible for classifying violations, had referred to hazardous violations in the initial regulations if it meant “immediately hazardous”, or as to why the Shanks stipulation provided for “B” violations.
In March, 1982, Gonzalez was commenced by order to show cause. A stay of eviction of petitioners was ordered, as in Goodwin. The Gonzalez petition similarly challenges respondent’s compliance with the regulation, claiming that whichever definition of “standard apartment” applies, the apartments that were shown were not standard apartments but were instead premises in substantial disrepair, infested with vermin, occupied by others, unaffordable, and/or dangerous. All petitioners argue that in view of the condition of the apartments, termination of their relocation benefits on the ground of “unjustified refusal of three standard apartments”, is arbitrary, capricious and contrary to law and fact.
In addition the Gonzalez petition alleges that the amended regulation is invalid both because it is contrary to the statutory scheme creating HPD, and was promulgated in a manner that was improper, arbitrary, and capricious.
The petitioners in both actions request class certification, move to consolidate Goodwin and Gonzalez, and seek preliminary and permanent injunctive relief. Respondent Gleidman has moved to dismiss both proceedings.
MOTION TO CONSOLIDATE
The request for consolidation, is granted to the extent of ordering joint hearings. There are common questions of *544 law and fact and the interest of all parties and the judicial system would be best served by resolving these matters in a single proceeding. (CPLR 602.)
MOTION TO CERTIFY CLASS
Petitioners have moved to certify a class consisting of “all persons who now reside at the Fox Street Shelter or will do so in the future.”
In order to accord class action status five prerequisites must be satisfied. (CPLR art 9.) They are numerosity, common questions of law and fact, typicality of named petitioners’ claims, fair and adequate representation by petitioners, and superiority of the class action format.
First, joinder must be impracticable because of the large number of members (CPLR 901, subd a, par 1). The petitioners allege that at any given time approximately 100 families are housed at the shelter. The identity of residents changes from time to time. Joinder of all present residents, in addition to ongoing joinder of any future residents is certainly impracticable as contemplated by CPLR 901 (subd a, par 1). The class shall be defined to include future residents of the shelter whose tenancies are terminated for failure to accept one of three standard apartments.
The next requirement is that common questions of law and fact predominate over issues affecting individual class members. Respondents argue that since there are differences among the petitioners as to which apartments each was offered, or what reason was given for refusal, there is an absence of commonality.
Petitioners point out the following common issues. First, respondents have not complied with their own regulations with respect to termination of relocation benefits in two major respects. They claim that regardless of which definition of standard apartment is used, petitioners as a class have not been referred to apartments satisfying that definition. They also claim that the termination hearings that were held did not comply with the provisions of the regulations pertaining to those hearings. Second, petitioners claim that the new definition of standard apartment is inconsistent with the statutory scheme of HPD. Finally they assert that the regulation containing the new definí *545 tion was improperly promulgated. They argue that these issues predominate even though individual petitioners may have been shown different apartments and refused them for different reasons.
The claims here involve not merely an individual injury, but a challenge to an agency policy applying to all prospective petitioners. The importance of resolving the substantial issues of law and fact common to all petitioners far outweighs the effect of any individual differences that may exist. (Bertrand v Sava, 535 F Supp 1020.) The court therefore finds that the requirement of CPLR 901 (subd a, par 2) is satisfied. (See Escalera v New York City Housing Auth., 425 F2d 853; Matter of Funderburke v New York City Dept. of Investigations, NYLJ, April 23, 1980, p 6, col 4.)
Third, CPLR 901 (subd a, par 3) requires that the claims of the named petitioners be typical of those of all class members. In this case the claims are identical in that all parties claim to have been offered apartments that were either not standard, or which were defined as standard pursuant to an invalid regulation, or not affordable, and that refusal to accept the apartments was the basis of the termination of shelter benefits.
Petitioners will also fairly and adequately represent the interest of the class as required by CPLR 901 (subd a, par 4). Since all claims are identical and all petitioners are faced with eviction, the named petitioners have no special interests which might override the interest of the class. Moreover, Bronx Legal Services has extensive experience in litigating cases involving the rights of the poor and can be expected to provide whatever representation is necessary.
Finally, there is the question of whether a class action is superior to other methods of adjudication. (CPLR 901, subd a, par 5.) Respondent argues that class certification is inappropriate where relief is sought against a government agency. The rationale is that the government will protect the rights of future claimants under the doctrine of stare decisis. While this rationale has often led the courts of this State to deny applications for class certification, it remains within the court’s discretion to grant class certification in *546 proper instances. (Felder v Foster, 71 AD2d 71.) The principle of stare decisis does not always protect the rights of potential petitioners.[10] (See Matter of 'Eisenstark v Anker, 64 AD2d 924; Doe v Greco, 62 AD2d 498.)
In this instance there are various factors which have convinced this court that the doctrine of stare decisis will not adequately resolve the issues here. A substantial number of potential petitioners would not gain access to the courts due to the housing emergency confronting them and other socioeconomic factors.
Even if all affected individuals could obtain judicial determinations, this would entail an unnecessary expenditure of energy and judicial resources. This problem is compounded by the fact that it is HPD that makes the decision to terminate rights to remain in the shelter but it is the private South Bronx Community Housing Corp. that brings summary proceedings to evict the resident. HPD is not a party in any such proceeding. The actions of HPD can be challenged only through administrative procedures and article 78 proceedings in Supreme Court. Thus, the petitioner is forced to litigate in two forums against two separate entities, one public and one private, in order to obtain relief.
The many identical proceedings commenced by Bronx Legal Services on behalf of relocatees further illustrate the need for granting class action status in order to obtain a final adjudication of the issues.
In addition, while there are already a number of individual petitioners, the claims of individual petitioners could well become moot during the course of the proceedings, as petitioners find satisfactory housing or leave the shelter for other reasons. A class action avoids the possibility that the important claims raised by petitioners will become moot.[11] (See Greklek v Toia, 565 F2d 1259, cert den sub nom. Blum v Toomey, 436 US 962.)
*547 In sum, class certification will assure that the claims raised by petitioners are judicially determined, and that all potential petitioners will be protected, whether or not they have access to the courts. At the same time the resources of the judicial system and counsel for both sides will be efficiently expended.
For all of the foregoing reasons a class action is preferable here. All requirements of CPLR 901 (subd a) having been satisfied, the request for class certification is hereby granted. (See, generally, Felder v Foster, 71 AD2d 71, supra; Matter of Eisenstark v Anker, 64 AD2d 924, supra; Doe v Greco, 62 AD2d 498, supra; Young v Shuart, 67 Misc 2d 689, mod on other grounds 39 AD2d 724.)
MOTION TO DISMISS
Respondent has not submitted answers to the petitions, but has moved to dismiss pursuant to CPLR 7804 (subd [f]). The allegations in the petitions are deemed to be true in deciding such motions. (Matter of Board of Educ. v Allen, 32 AD2d 985.)
1. NONCOMPLIANCE WITH REGULATION
With respect to the first cause of action claiming noncompliance with the regulations, the motion to dismiss sets forth the general practices of HPD concerning relocatees. The commissioner argues that the terminations were all executed in accordance with law, and that administrative determinations should not be disturbed in the absence of a clear abuse of discretion or error of law. In further support of the motion respondent has submitted abstracts of HPD’s records of attempts to relocate the various petitioners, and the hearing officers’ decisions.
Petitioners make two points in opposition. First, petitioners question the accuracy of HPD’s records, pointing to various inconsistencies in the data. They assert that the apartments offered did not meet respondent’s own criteria under either version of the regulation, in that they were infested with vermin, in substantial disrepair, unaffordable, and otherwise detrimental to health and safety. In addition, petitioners assert (in their memorandum but not their pleadings) that in actual practice the hearing procedure prescribed in the regulations is not followed.
*548 At best respondent claims that HPD has acted in compliance with its regulations, but has failed to demonstrate why dismissal as a matter of law is warranted. (CPLR 7804, subd [f].) Indeed the court notes that respondent’s own exhibits reveal that although the published regulation prior to November, 1981 contained a “B” violation standard, HPD had consistently acted as though a “C” violation standard were in effect. Attached to respondent’s motion to dismiss is a copy of the notice sent to the City Record in September, 1981 in connection with the amendment to the regulation. That notice explicitly states that the Division of Relocation Services “has always interpreted the definition of standard apartment as [an apartment in a building with no more than three immediately hazardous violations] and has acted accordingly.” (Emphasis supplied.) This not only defeats the motion to dismiss but in fact bolsters petitioners’ claim of noncompliance.
Therefore the motion to dismiss is denied with respect to the first cause of action. Issues for trial include whether the apartments on HPD’s list were in fact standard under either version of the regulation, whether they were affordable and whether the hearing procedures complied with the statute.
2. VALIDITY OF REGULATION
With respect to the validity of the amended regulation the parties have briefed this issue and have agreed that my decision on this claim shall be dispositive. It is important to bear in mind that the significance of the regulation lies in the fact that refusal of three “standard” apartments may lead to eviction from the shelter and total homelessness.
Petitioners have urged that the change in respondent’s regulation defining “standard apartment” is invalid on substantive and procedural grounds. Each will be discussed in turn.
a. SUBSTANTIVE INVALIDITY
Petitioners argue that HPD’s regulation which requires families to choose between accepting and moving into apartments in buildings with up to three immediately *549 hazardous violations, or losing their right to stay in the emergency shelter, violates HPD’s statutory mandate. In assessing this claim it must be recognized that HPD is empowered to promulgate only those regulations which are consistent with the goals embodied in its enabling statute, and may not establish rules which are out of harmony with that legislation. (Matter of Jones v Berman, 37 NY2d 42; Matter of Harbolic v Berger, 43 NY2d 102). In implementing the legislative mandate HPD has broad discretion (Matter of Kaye v Whalen, 56 AD2d 111, affd 44 NY2d 754). Accordingly, the court must determine whether the agency has acted in a manner consistent with its legislative mandate and then, as respondent argues, this court must limit its inquiry to whether the administrative determination has a rational and reasonable basis. (Matter of Colton v Berman, 21 NY2d 322, 329.)
HPD’s statutory duties while broadly defined, clearly require it to conduct its affairs so as to preserve and improve the housing stock in the city and to provide for the relocation of families who lose their housing through no fault of their own.[12] A policy of referring families to apartments in buildings with up to three immediately hazardous violations does not appear designed to encourage landlords to maintain the housing stock. Petitioners argue, for example, that relocatees may be referred to apartments which may become subject to vacate orders, just like the ones relocatees were forced to leave. Such a procedure merely perpetuates the cycle of homelessness, shelter, and relocation. Moreover, rather than assessing fines against landlords, HPD rewards them with a finder’s fee if a relocatee accepts an apartment, however unsafe or whatever its condition.
In support of the regulation respondent argues that the agency’s determination as to how to implement its task must be accorded great weight by the reviewing court. The commissioner asserts that the regulation is rational on its face because its definition of “standard apartment” accurately reflects the condition of the housing stock. Respondent states that while relocatees are obligated to sign a lease, pay a month’s rent and move in before repairs are *550 undertaken, the relocatee can be released from the commitment after 21 days. Finder’s fees are paid only if the tenant remains. Respondent submits that this is the only way to improve the housing stock because a rent-paying tenant in occupancy provides the incentive for repairs and protects against vandalism.
The court cannot at this time make the determination whether the regulation has a rational and reasonable basis. The implementation of the amended version of section 3.01(g)(1) would appear to exacerbate the problem of the homeless in our city either directly by evicting shelter residents and adding to the number of homeless, or by relocating them to grossly inferior housing through a system which is not designed to improve the condition of the housing stock, in either case defeating the goals of HPD. Changing the definition of standard apartment in response to market conditions, as respondent seems to have done, would appear to contravene the statutory mandate and abet the deterioration of residential real estate in New York City.
Petitioners have also argued that respondent has given no rationale for selecting three immediately hazardous violations as the limit for a standard apartment suitable for relocation as opposed to some other number, or combination of violations, or some other measure. Indeed as petitioners assert, “there is no indication that the challenged regulation has any rational relationship to any legitimate policy sought to be furthered by HPD.” The court agrees that respondent has not yet made that showing in these proceedings.
In order to determine whether the regulation is rational, some further consideration would have to be given to questions such as the following: Why should apartments not be fixed prior to the relocatee’s payment of rent, when another tenant might be entitled to an abatement for some of the conditions under which a relocatee must pay rent? Why should landlords be given a 21-day period to repair immediately hazardous violations and receive finder’s fees if an apartment is “accepted” when HPD is charged with forcing landlords to cure such violations immediately? In view of the duty vested in respondent to enforce the Hous *551 ing Maintenance Code, why is relocation not an appropriate occasion for HPD to intercede on behalf of relocatees and force landlords to improve apartments before they are entitled to collect rent? Indeed, what reasoning process, if any, did HPD go through in determining its definition of standard apartment or the process for referral and termination.
In sum, respondent has adopted a regulation which exposes the petitioner class to a clear threat of eviction for refusing to live in apartments which contain blatant violations of the Housing Maintenance Code. While the court is aware of the magnitude of the problem of sheltering the homeless,[13] and of the difficulty respondent has in meeting his varied statutory duties, the court cannot conclude on the basis of the papers submitted to date, that the change in the regulation challenged herein is clearly consistent with respondent’s statutory duties and has a rational and reasonable basis. Accordingly, the motion to dismiss is denied with respect to this claim.
b. PROCEDURAL INVALIDITY
Petitioners claim that the amendment to the regulation was made in violation of the lawful procedure and in a manner that is arbitrary and capricious (CPLR 7803, subd 3).
Section 1105 of the New York City Charter, which governs promulgation of regulations, requires that notice of proposed amendments together with an explanation of the amendments be published in the City Record and mailed to civic groups, community boards, members of the city council and the news media. The purpose of such notice *552 is to afford interested persons an opportunity to comment (New York City Charter, § 1105, subd b).
The amendment to the regulation challenged herein was enacted in a manner that was in technical compliance with section 1105, but which was at substantive variance with the underlying purpose of section 1105, namely to assure that the agency is taking action that is well informed, reasonable and designed to further its statutory purpose. This court finds the agency’s conduct to have been arbitrary and capricious, and holds that the adoption of the amendment is therefore invalid.
The amendments were promulgated in a three-step process. On September 16, 1981, Martin Siroka, deputy general counsel to HPD submitted the proposed amendments to the City Record and asked that they be published. The proposed regulations were published in the City Record on September 25 and October 12, 1981, and became effective November 6, 1981; in addition, notices of the proposed amendments were sent to a variety of civic organizations and news media.
On its face, these actions would appear to satisfy section 1105. Yet the purpose of section 1105, as respondent’s counsel succinctly states it, is “to promote * * * notice to interested persons of proposed regulations or amendments thereto.” Respondent knew or should have known that counsel for petitioners herein represented persons who would be extremely interested in this amendment, since their clients were families in the Fox Street Shelter who had initiated article 78 proceedings which, like the instant matters challenged relocation procedures (Shanks, et al.). Since the proposed amendment, if adopted, would totally undermine the petitioners’ cause of action in those cases, fairness and courtesy warranted notifying any petitioner’s family and its counsel at such time, even if it were not required by the specific terms of section 1105. The agency’s failure to give notice to individuals who would be immediately concerned, when it gave notice to so many others, warrants the conclusion that the amendment was adopted in an arbitrary and capricious manner.[14]
*553 Even more significant, counsel for petitioners in the Shanks cases were not involved simply in ongoing litigation on September 16, 1981. They were negotiating the Shanks stipulation referred to above, in which HPD agreed that it “understood” that “standard apartment” in regulation 3.01(g) is defined in terms of hazardous violations. That stipulation was signed on September 22, 1981, six days after submission of the amendment to the City Record, by Susan Barrie of Bronx Legal Services for petitioners and Steven Kaplan for respondents, the same attorneys who are appearing before me in this case.
The notice of-amendment sent to the City Record on September 16, 1981, is totally contrary to the understanding reached in the stipulation. It states that HPD’s intent when it originally adopted the regulation was to define a standard apartment as one in a building with no more than three immediately hazardous violations, and that the amendment would “clarify” the term standard apartment. Moreover, the agency asserted: “The Division of Relocation Services has always interpreted the definition of standard apartment in accordance with the above [i.e., in terms of three immediately hazardous violations] and has acted accordingly.” (Emphasis supplied.)
The contradiction between HPD’s stipulation which committed the agency to a “hazardous violation” standard, and its statement in the City Record which implied that historically the agency had employed an “immediately hazardous” standard, reveals an agency that was moving in opposite directions at the same time. The disparity is so blatant as to warrant the conclusion that the amendment was not the outgrowth of a long-standing administrative policy, but that it was adopted in an arbitrary and capricious manner.[15]
The third reason for finding that the amendment was adopted in an arbitrary and capricious manner is that the explanation given the public about the reason for the change appears inconsistent with the record and is, in any event, inadequate to allow meaningful public comment. A *554 review of the regulations from their inception in Calderon to just prior to the 1981 amendment reveals repeated reference to “hazardous violations” but no mention of “immediately hazardous” violations. The agency’s asserted justification for the amendment — that by “hazardous” (“B” violation) it always meant “immediately hazardous” — is not borne out by the record, and is merely an unsupported assertion that its published regulations meant something other than what the clear language stated.[16] An agency may not justify significant changes in policy by an unsupported assertion that it had always meant something entirely different, if rulemaking is to remain a rational procedure. For this reason as well the court holds that section 3.01(g) as amended is without rational basis and was promulgated in an arbitrary and capricious manner, and is therefore invalid.
REMEDY
I turn now to the problem of fashioning an effective remedy. Petitioners have asked this court for (1) a permanent injunction, preventing respondents from enforcing the “immediately hazardous” version of section 3.01(g), and (2) a preliminary injunction prohibiting evictions from the shelter for unjustified refusal of three standard apartments.
Based upon the foregoing decision respondent is permanently enjoined from enforcing section 3.01(g) of the regulations to the extent that it defines standard apartment as one in which there are no more than three immediately hazardous violations in the building, unless and until such regulation is promulgated in such a manner as to comply with both the letter and the spirit of the relevant sections of the New York City Charter and the Administrative Code.
Rejection of apartments considered standard under the agency’s current regulation cannot be considered “unjustified” within the meaning of section 3.07 of the regulations.
*555 Therefore any member of the petitioner class whose shelter termination was based on the “immediately hazardous” version of the regulation is entitled to new apartment referrals.
With respect to the preliminary injunction, certain factors must be considered in granting this type of injunctive relief. Petitioners must show that they will sustain irreparable injury, that there is a likelihood of success on the merits and that the balance of equities is in their favor. (CPLR 6301.) It cannot be reasonably disputed that petitioners would suffer irreparable harm if they were evicted from the shelter. (Coyle v Chun Kien Realty Corp., NYLJ, Sept. 12, 1980, p 6, col 3; Matter of Funderhurke v New York City Dept. of Investigations, NYLJ, April 23, 1980, p 6, col 4.)
Although respondent’s papers do not technically constitute an answer, there is sufficient evidence in the affidavits of both sides to warrant a finding of likelihood of success on the merits. The affidavits seem to demonstrate that many of the apartments shown were in such a serious state of disrepair or were beyond the financial means of members of the petitioner class as to support a finding that there is a substantial likelihood the apartments shown did not meet the criteria of the regulation, either before or after the amendment.
Petitioners have also demonstrated a likelihood of success with respect to a need to modify the hearing procedure. The decisions attached to the papers show that the only factual finding is that three apartments that were on HPD’s “standard list” were shown and that they were refused. There are no findings of fact as to the true condition of apartments shown or the validity of the relocatee’s refusals, even though specific findings of fact are required by the regulations. Indeed, it appears to me that at least one reason for the commencement of these proceedings in the first instance was the inadequate hearing and appeal procedure now in existence.[17]
In balancing the equities it is clear that the drastic consequence to the petitioners far outweighs any prejudice
*556 respondent may suffer as a result of a preliminary injunction pending the outcome of this proceeding.
Based on the foregoing the court orders the following:
All terminations of relocation benefits to members of plaintiff class based on refusal to accept referrals to standard apartments are preliminarily enjoined pending determination as to whether respondent HPD is engaged in a pattern or practice of terminating relocation benefits in a manner inconsistent with its own regulations.

. See, e.g., New York Times, April 1,1983, p 1; March 31, 1983, p 1; Feb. 6,1983, p 32; Jan. 24,1983, p 29; Callahan v Carey, index No. 42582/79, Supreme Ct, NY County.

. Respondent South Bronx Housing Corporation has appeared but has not submitted papers in this proceeding.

. Changes were made in certain sections of article 5 as well. This decision applies to those sections also.

. Affidavit of Mordecai Parnés, Director of the Bureau of Emergency Housing Services, dated May 24, 1982, paragraph 7, states that rent must be within acceptable limits.

. A third important element of the regulations promulgated pursuant to Calderon is the establishment of a hearing procedure prior to termination of benefits.

. It appears that this aspect of the 1975 regulations may have been consistent with pre-existing agency policy. A 1971 mimeographed document for the Department of Relocation and Management Services entitled “Relocation Benefits Payable to Residential Tenants on Federally Subsidized Project Sites When the City Becomes the Landlord” (eff Jan. 2, 1971) defined a “standard apartment” as one, inter alia, with no hazardous violations. Neither party has explained the relationship of this document to the case at hand, however.

. “Suitable accommodation” is defined solely in terms of size, and may have been considered to have the same meaning as “suitable referral” (§ II.A.2).

. HPD’s classifications of violations are contained in exhibit D to petitioners’ supplemental memorandum on the validity of respondent’s amended regulation.

. See letters and attachments appended as exhibits A, C, D to respondent’s cross motion.

. See Braveman, Class Certification in State Court Welfare Litigation: A Request for Procedural Justice (28 Buffalo L Rev 57) for an excellent discussion of the need to certify class actions in welfare cases and other cases affecting poor people, as well as a persuasive argument that the stare decisis principle is often ineffective in protecting the rights of litigants.

. 28 Buffalo L Rev 57, at pp 68-73.

. Néw York City Charter, ch 61, § 1802; Administrative Code, § 1160-1.0 et seq.

. Some of the articles cited at n 1 not only reveal the serious nature of the problem, but actually support the validity of petitioners’ claims. For example in the New York Times, Jan. 24, 1983, p A 1, an agent of the Human Resources Administration, which assumes responsibility for relocatees after two months in a shelter, points out the difficulty in finding affordable decent apartments: “ ‘It just isn’t enough * * * The families just can’t find anything they can afford. We really can’t ask them to take their food money and spend it on rent.’ ”
In the same article, a member of HPD’s staff is quoted as saying “ ‘Frankly the apartments are usually not that great * * * A lot of these people are hoping to improve on what they have come from. A lot of them want to get into public housing, but there just isn’t any available’ ”.
The article of April 1,1983 indicates that many of those either on public assistance or receiving low wages are forced to pay far more than their shelter allowance provides to obtain housing.

. While it is not necessary to this decision, under these circumstances it would appear that Bronx Legal Services, a borough-wide organization, should properly be considered to have requested “such notification” under subdivision d of section 1Í05.

. Further evidence that the agency failed to scrupulously follow proper procedure is found in its admitted failure to notify counsel in Calderon (supra) of the impending change in the regulation despite the provision in the stipulation, so ordered by the District Judge, that they do so.

. The agency has also asserted in this case that “under Calderon, it was HPD’s intent to define a standard apartment as one with no more than three (31 immediately hazardous violations.” Yet as shown above, the term “standard apartment” was not used in the Calderon regulations, or, apparently, for several years thereafter. This would appear to offer further evidence that the explanation given by the agency for its amendment is erroneous.

. In reviewing the hearing notice, I note that unlike fair hearing notices for Medicaid benefit rejections, there is no telephone number or address of legal services offices.