■ In the Matter of JAMES SMITH et al., Respondents, v SHAUN DONOVAN, as Commissioner of the Department of Housing Preservation and Development, Appellant. [878 NYS2d 675]—

Order and judgment (one paper), Supreme Court, New York County (Paul G. Feinman, J.), entered May 6, 2008, which granted a CPLR article 78 petition to annul respondent Department of Housing Preservation and Development's (HPD) denial of relocation assistance to petitioners, directed HPD to provide petitioners with any relocation services it would ordinarily provide to a relocatee as defined in 28 RCNY 18-01 (a), and declared that tenants in buildings subject to orders to vacate are entitled to relocation services from HPD pursuant to Administrative Code of the City of NY § 26-301 whether or not the dwelling units that are subject to the vacate orders are lawful, unanimously affirmed, without costs.

The 12 petitioners occupied shared rooms in a two-story multiple dwelling located in the Bronx. The building contains apartments on the first and second floors, each of which has four bedrooms, a kitchen, bathroom, and living room. In addi-

tion, the basement was converted into an apartment with two rooms, a kitchen, and a bathroom.

Petitioners moved into the building at various times between April 2007 and December 2007. They were told that the building was operated under the name "AJ Family House" as a "three-quarter house," which had a drug- and alcohol-free environment and imposed an 11:00 P.M. curfew. It is uncontested that all of petitioners paid rent and entered into their rental agreements with a woman who allegedly leased the building from the owners. Petitioners all believed that the facility was a legal residence.

All the petitioners, save one, stayed in rooms on the first and second floors which were furnished with bunk beds that could sleep four to six men; the kitchen and bath facilities were shared by 11 to 16 men. Petitioners state that the house was drug and alcohol free, and that the roommates cooked together, shared responsibility for cleaning, studied Bible, and watched videos. They received their state and federal benefits there, kept personal possessions there, and received mail there.

In December 2007, the leaseholder commenced a proceeding against the owners in the Housing Part of the New York City Civil Court in Bronx County. Subsequently, an HPD inspector was sent to inspect the building. On December 26, 2007, the HPD inspector found six class B violations, including illegal conversion to a multiple dwelling, and directed that the premises be restored to lawful occupancy.

On January 3, 2008, HPD issued a vacate order to the owners, lessees and occupants of the building. The vacate order charged that the dwelling had conditions rendering it dangerous to life and unfit for human habitation, including an illegal apartment created in the basement and illegal rooming units and/or single room occupancies on the first and second floors. HPD directed the owner to provide an adequate supply of heat, seal up accessible openings in the cellar apartment, and to legalize the conversion from a private dwelling to multiple dwelling use, if legally feasible, or else restore to lawful occupancy. HPD also directed a fire watch for the entire building.

On January 17, 2008 petitioners contacted HPD and requested that it provide them with relocation assistance pursuant to Administrative Code § 26-301 (1). The statute provides that the Commissioner of HPD has a duty to provide relocation services to certain tenants. It further provides:

"1. The commissioner of housing preservation and development shall have the power and it shall be his or her duty:

"(a) To provide and maintain tenant relocation services . . .

"(v) for tenants of any privately owned building where the displacement of such tenants results from the enforcement of any law, regulation, order or requirement pertaining to the maintenance or operation of such building or the health, safety and welfare of its occupants." (Administrative Code § 26-301 [1] [a] [v].)

Rules promulgated by HPD define "relocatee" as: "[A]n individual . . . deprived of a permanent residence rented by him/her or them in the City of New York as a direct result of the enforcement of a Vacate Order" (28 RCNY 18-01 [a]).

On January 23, 2008, after HPD refused the request on the ground that petitioners' occupancy was "illegal," petitioners commenced this article 78 proceeding by order to show cause. Petitioners sought a judgment (1) granting a writ of mandamus, pursuant to CPLR 7801, directing HPD to provide relocation assistance, and (2) declaring that tenants in privately owned buildings subject to a vacate order are entitled to relocation services, pursuant to Administrative Code § 26-301, regardless of whether the dwelling units subject to the vacate order are lawful.

By decision, order and judgment dated April 30, 2008, Supreme Court granted the petition and annulled HPD's decision to deny relocation assistance to petitioners. The court remitted the matter to HPD with directions "forthwith to provide [p]etitioners with any and all services and assistance it would ordinarily afford a relocatee as defined in section 18-01 (a) of the Rules of the City of New York." The court declared that "tenants in buildings subject to orders to vacate are entitled to relocation services by the Respondent [HPD], pursuant to section 26-301 of the Administrative Code, whether or not the dwelling units which are subject to the order of vacate are lawful."

On appeal, HPD argues that Administrative Code § 26-301 (1) only requires HPD to offer temporary relocation services "to an individual occupying a lawfully configured dwelling unit as his/her permanent residence," and that "illegal and hazardously configured dwelling units in violation of the Building Code and Multiple Dwelling Law cannot create a true and actual tenancy." In support of its argument, respondent relies on the affidavit of Associate Commissioner for Enforcement Services, who asserts, inter alia, that the term "tenant," as used in the Administrative Code, "connotes a person residing in a lawfully configured dwelling unit occupied as his/her permanent residence with the consent of the owner." Based on that connotation, the commissioner argues that it is "HPD's policy to provide relocation services only to individuals vacated from lawfully configured resi-

dential units otherwise rendered inhabitable [*sic*] and/or unsafe due to fire, flood, structural problem or other disaster."

Petitioners assert that Supreme Court correctly determined that they meet the unambiguous requirements of the Administrative Code for receipt of relocation assistance in that they paid monthly rent to reside in a privately-owned building and are being displaced as a result of a vacate order. Moreover, petitioners maintain that the broad language of section 26-301 in no way limits the definition of "tenants" entitled to relocation assistance to persons who live in lawfully configured residences. They further assert that respondent's interpretation of Administrative Code § 26-301 (1) ignores the legislative intent behind the statute, which is to provide relocation assistance to tenants who lose their housing through no fault of their own.

For the reasons set forth below, we find that Supreme Court properly concluded that tenants in buildings subject to orders to vacate are entitled to relocation services by HPD, pursuant to Administrative Code § 26-301 (1), regardless of whether the dwelling units which are subject to the vacate orders are lawful.

The fundamental rule of statutory interpretation is that a court "should attempt to effectuate the intent of the Legislature" (*Majewski v Broadalbin-Perth Cent. School Dist.*, 91 NY2d 577, 583 [1998] [internal quotation marks and citations omitted]). Since "the clearest indicator of legislative intent is the statutory text, the starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof" (*id.*). Further, "it is a well-established rule that resort must be had to the natural signification of the words employed, and if they have a definite meaning, which involves no absurdity or contradiction, there is no room for construction and courts have no right to add to or take away from that meaning" (*id.* [internal quotation marks and citations omitted]). " '[N]ew language cannot be imported into a statute to give it a meaning not otherwise found therein' " (*Matter of Chemical Specialties Mfrs. Assn. v Jorling*, 85 NY2d 382, 394 [1995], quoting McKinney's Cons Laws of NY, Book 1, Statutes § 94, at 190).

It is well settled that an agency's interpretation of a statute that it is charged with administering is entitled to deference if it is not irrational or unreasonable (*Seittelman v Sabol*, 91 NY2d 618, 625 [1998]; *Matter of Howard v Wyman*, 28 NY2d 434, 438 [1971]). However, where "the question is one of pure statutory reading and analysis, dependent only on accurate apprehension of legislative intent, there is little basis to rely on any special competence or expertise of the administrative agency" (*Kurcsics*

*v Merchants Mut. Ins. Co.*, 49 NY2d 451, 459 [1980]). "In such a case, courts are 'free to ascertain the proper interpretation from the statutory language and legislative intent' " (*Seittelman*, 91 NY2d at 625, quoting *Matter of Gruber [New York City Dept. of Personnel—Sweeney]*, 89 NY2d 225, 231-232 [1996]).

Applying these rules, we find that HPD's interpretation of Administrative Code § 26-301 (1) is contrary to the plain meaning of the statute. Section 26-301 requires HPD to provide relocation services to any tenant displaced as the result of "enforcement of *any* law, regulation, order or requirement pertaining to the maint[e]nance or operation of such building or the health, safety and welfare of its occupants" (subd [1] [a] [v] [emphasis added]). HPD's interpretation creates a broad exception to the applicability of the statute, by excluding all persons displaced as a result of vacate orders that enforce the law requiring an owner to obtain a certificate of occupancy for conversion of a private dwelling to multiple dwelling use (Multiple Dwelling Law §§ 301, 302). HPD asserts that its policy is also to limit relocation assistance to situations in which a vacate order is issued following some "disaster," such as flood or fire, which further limits the plain language of the statute. However, an administrative policy that "graft[s]" onto the statute an addendum that excludes only certain tenants and vacate orders violates the plain meaning doctrine (*see Matter of Raritan Dev. Corp. v Silva*, 91 NY2d 98, 104-105, 107 [1997] [declining to enforce agency's interpretation which grafted exception onto zoning resolution]).

Furthermore, in *Matter of Cupidon v Donovan* (8 Misc 3d 1024[A], 2005 NY Slip Op 51263[U] [2005]), HPD argued, as it does here, that the petitioner could not be deemed a permanent resident under Administrative Code § 26-301 (1) and section 18-01 of the Rules of the City of New York because he would be subject to vacatur at any time because his occupancy of the unit violated the law.* The *Cupidon* court flatly rejected HPD's interpretation as negating the plain language of the statute and regulation as well as the clear intent to provide location assistance to tenants who lose their housing through no fault of their own (2005 NY Slip Op 51263[U], *3, citing *Matter of Goodwin v Gleidman*, 119 Misc 2d 538, 549 [1983]).

---

* As a general matter, it is presumed "that the government will abide by court rulings in future cases involving similarly situated petitioners, under principles of stare decisis" (*Jamie B. v Hernandez*, 274 AD2d 335, 336 [2000]). Here, HPD baldly asserted in its verified answer that it was "not bound" by the unappealed ruling in *Cupidon* and on appeal, it makes no effort to distinguish the case despite the fact that it is directly on point.

Moreover, we reject HPD's argument that it is not creating an exception, but is simply interpreting the term "tenant," which it asserts cannot include persons who rent space in an illegal multiple dwelling. HPD repeatedly states, without citation of any legal authority, that a legal tenancy cannot be created in an illegal multiple dwelling because occupancy of an apartment lacking a valid certificate of occupancy is prohibited (Multiple Dwelling Law § 301), and the landlord cannot recover rent for occupancy of such unit (Multiple Dwelling Law § 302 [1] [b]).

To the extent the term "tenant" is ambiguous, courts may look to statutory definitions as an aid to interpretation and should interpret (see *Jericho Water Dist. v One Call Users Council, Inc.* 10 NY3d 385, 390-391 [2008] [referring to definitions of "municipality" in different statutes to aid interpretation]), and consider any well-defined technical or common-law meaning (McKinney's Cons Laws of NY, Book 1, Statutes § 233). Administrative Code § 26-301 (1) does not define "tenant," but definitions in the New York City Rent and Rehabilitation Law and in the state Real Property Actions and Proceedings Law do not make the issuance of a certificate of occupancy a prerequisite to the creation of a tenancy (see Administrative Code § 26-403 [m] [tenant is a "tenant, subtenant, lessee, sublessee, or other person entitled to the possession or to the use or occupancy of any housing accommodation"]; RPAPL 711 ["tenant" includes "an occupant of one or more rooms in a rooming house"]). Petitioners are tenants under these definitions since they paid rent and were entitled to possess or use rooms in the housing accommodation.

Further, HPD's argument that a person cannot be a "tenant" of an apartment that is not in compliance with Multiple Dwelling Law §§ 301 and 302 is unsupported by case law. In *Sima Realty v Philips* (282 AD2d 394 [2001]), we rejected a similar argument by a landlord seeking to rely on the absence of a certificate of occupancy to eject a tenant. In determining that there was no merit to the landlord's contention that the occupants should be ejected because the premises did not have a residential certificate of occupancy we stated: "[the multiple occupancy] law was enacted to protect tenants of multiple dwellings against unsafe living conditions, not to provide a vehicle for landlords to evict tenants on the ground that premises are unsafe" (*id.* at 395; *see also Zane v Kellner*, 240 AD2d 208 [1997]). Similarly, we find that HPD cannot rely solely on the fact that petitioners lived in a dwelling unit that was not in compliance with the Multiple Dwelling Law as a vehicle to deny them relocation services.

To the extent HPD argues on appeal a different or alternative rationale for denying relocation services, we are constrained to review only the grounds it invoked in denying petitioners' request for such services (*see Matter of Trump-Equitable Fifth Ave. Co. v Gliedman*, 57 NY2d 588, 593 [1982]). Concur— Gonzalez, P.J., Mazzarelli, Friedman, Catterson and Renwick, JJ.