Morse v Fidessa Corp. (2018 NY Slip Op 05975)





Morse v Fidessa Corp.


2018 NY Slip Op 05975


Decided on September 6, 2018


Appellate Division, First Department


Acosta, P.J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on September 6, 2018
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Rolando T. Acosta,P.J.
Peter Tom
Jeffrey K. Oing
Peter H. Moulton, JJ.


158948/16 6223 

[*1]Christopher Morse, Plaintiff-Respondent,
v
Fidessa Corporation, et al., Defendants-Appellants.



Defendants appeal from the order of the Supreme Court, New York County (Arlene P. Bluth, J.), entered August 8, 2017, which, insofar as appealed from as limited by the briefs, denied their motion to dismiss the complaint.




Fox Rothschild LLP, New York (Daniel A. Schnapp and Gregg M. Kligman of counsel), for appellants.
Mark L. Lubelsky & Associates, New York (Mark L. Lubelsky and Josef K. Mensah of counsel), for respondent.



ACOSTA, P.J.


At issue in this matter of first impression is whether the New York City Human Rights Law's (HLR) prohibition against discrimination based on "marital status" encompasses a prohibition against discrimination on the basis of the identity of a person's spouse. In light of the uniquely broad and remedial purposes of the City HRL, we hold that "marital status" must be given a broader meaning than simply married or not married, and that it must encompasses other factors that may be used to deem the relationship "disqualifying," i.e., unacceptable. Accordingly, the complaint before us, which alleges that defendant Fidessa Corporation terminated plaintiff's employment after an employee who Fidessa believed was married to plaintiff left its employ states a cause of action for discrimination under the City HRL
I. Facts
Fidessa Corporation is a financial services company. Plaintiff, a former Fidessa employee, asserted a violation of the New York City Human Rights Law (Administrative Code of City of NY § 8-107 et seq.), by alleging that he was suspended and then fired by Fidessa [*2]because a co-employee, Lael Wakefield, whom Fidessa perceived to be plaintiff's spouse and with whom plaintiff had two children, had left Fidessa to work for another financial services firm. Plaintiff also alleged that he was told that he was fired because of this perceived marital relationship, and that, if he divorced Wakefield, he would be reconsidered for re-employment [FN1]. Plaintiff identified a comparator: an unmarried couple where both partners initially worked for Fidessa, and one left to work for a different financial services firm, but the partner who remained at Fidessa was neither suspended nor fired.
Defendants moved to dismiss the complaint on the ground that City HRL's protection did not extend to employment decisions based on the identity of the employee's partner or spouse, but only on the basis of whether he or she was married or not. The motion court denied the motion. We now affirm.
II. Discrimination on the basis of marital status
The City HRL states, in relevant part:
"It shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived . . . marital status . . .
(2) To refuse to hire or employ or to bar or to discharge from employment such person or
(3) To discriminate against such person in compensation or in terms, conditions or privileges of employment" (Administrative Code § 8-107[1]).
From the complaint it appears that Fidessa treated plaintiff and his partner differently from the aforementioned similarly situated couple based on its perception that they were married to one another and the members of the other couple were not. Thus, the question is whether discrimination based on "marital status" encompasses discrimination based on marital status in relation to a person relevant to Fidessa. In other words, is an employer prohibited from discharging an employee because of the employee's marriage to a particular person.
For the purposes of this analysis, the fact that defendant was not alleged to be "biased against" married couples in all circumstances is of no moment: the factor in terminating plaintiff's employment was plaintiff's marital status in relation to the employee who left the company. Thus, plaintiff's termination was based on his marital status.
A.
Before the passage of the Local Civil Rights Restoration Act of 2005 (Local Law No. 85) (the Restoration Act), the Court of Appeals had resolved the above-stated question  without recourse to liberal construction analysis  by holding that "a distinction must be made between the complainant's marital status as such, and the existence of the complainant's disqualifying relationship  or absence thereof  with another person" (see Levin v Yeshiva Univ., 96 NY2d 484, 490 [2001] [a housing discrimination case]). In Levin, the "disqualifying relationship" was one that was not a "legally recognized, family relationship []" (id. at 490-91). Thus, if a housing provider refused to rent to an unmarried person, regardless of whether the unmarried person was living with another person, its conduct would be actionable. However, if the housing provider treated an unmarried couple disadvantageously, that would not be actionable because the disadvantageous treatment would be based on the couple's marital status but on the disqualifying relationship (not being a "legally recognized, family relationship []").
[*3]Levin's holding was derived from Matter of Manhattan Pizza Hut v New York State Human Rights Appeal Bd. (51 NY2d 506 [1980]), an employment discrimination case brought under the New York State Human Rights Law, not the City HRL. Manhattan Pizza Hut ruled that the "plain and ordinary meaning of marital status' is the social condition enjoyed by an individual by reason of his or her having participated or failed to participate in a marriage" (51 NY2d at 511). That is, "when one is queried about one's marital status', the usual and complete answer would be expected to be a choice among married', single', etc., but would not be expected to include an identification of one's present or former spouse and certainly not the spouse's occupation" (id. at 511-512).
The Restoration Act changed the judicial landscape with respect to the City HRL. A more recent enactment, Local Law No. 35 (Local Law 35) (2016) of City of New York, went even further. That law amended Administrative Code § 8-130 ("Construction") "to provide additional guidance for the development of an independent body of jurisprudence for the New York city human rights law that is maximally protective of civil rights in all circumstances" (Local Law 35 § 1).
In the March 8, 2016 report of the Committee on Civil Rights that accompanied Local Law 35 (the Committee Report [FN2]), the Council set forth its concerns:
"Over at least the last 25 years, the Council has sought to protect the HRL from being narrowly construed by courts, particularly through major legislation adopted in 1991 and 2005. These actions have expressed a very specific vision: a Human Rights Law designed as a law enforcement tool with no tolerance for discrimination in public life. The 2005 Restoration Act provided that the HRL is to be interpreted liberally and independently of similar federal and state provisions to fulfill the uniquely broad and remedial' purposes of the law. The Act amended the HRL's liberal construction provision, Administrative Code § 8-130, to accomplish this goal. Some courts have recognized and followed this vision, but others have not, and many areas of the law remain as they were before the 2005 Restoration Act because they have not been scrutinized to determine whether they are consistent with the uniquely broad requirements of the HRL" (at 8 [emphasis added]).
The amendment included ratification of three decisions under the City HRL: Albunio v City of New York (16 NY3d 472 [2011]); Bennett v Health Mgt. Sys., Inc. (92 AD3d 29 [1st Dept 2011], lv denied 18 NY3d 811 [2012]); and Williams v New York City Hous. Auth. (61 AD3d [1st Dept 2009], lv denied 13 NY3d 702 [2009]) (hereinafter the Committee Report cases) (Administrative Code § 8-130[c]). Each of the cases was described as having "correctly understood and analyzed the liberal construction requirement" of the City HRL, and as having "developed legal doctrines accordingly that reflect the broad and remedial purposes" of the HRL (id.) To ignore or deviate from any of the Committee Report cases would be to flout the Council's intent as to the HRL.
The Committee Report elaborated thus:
"These cases do not just establish specific ways in which the HRL differs from its federal and state counterparts; they also illustrate a correct approach to liberal construction analysis and then develop legal doctrine accordingly. It is therefore important for courts to examine the reasoning of the cases—including their extensive discussions of why the U.S. Supreme Court's analysis can be inadequate to serve the purposes of the HRL—and then for courts to employ that [*4]kind of reasoning when tackling other interpretative problems that arise under the HRL. Finally, Int. No. 814-A [an earlier version of the bill] would remind courts that legal doctrine might need to be revised to comport with the requirements of § 8-130 of the Administrative Code" (Committee Report at 12-13).
Among other examples of the correct approach to enhanced liberal construction analysis under the Restoration Act, the Council quoted the following language from Williams:
"[T]he Restoration Act notified courts that (a) they had to be aware that some provisions of the City HRL were textually distinct from its state and federal counterparts, (b) all provisions of the City HRL required independent construction to accomplish the law's uniquely broad purposes, and (c) cases that had failed to respect these differences were being legislatively overruled" (Committee Report at 10-11; see Williams, 61 AD2d at 67-68 [footnote omitted]).
Before the Restoration Act was enacted, there were few cases that distinguished between the City HRL and its state or federal counterpart, and the City HRL was not viewed as having "uniquely" broad purposes. Eleven years later, the Council was insisting that the "legislative overrule" be given effect.
Critically, the Council quoted Williams approvingly with respect to the purpose of the construction provision (Administrative Code § 8-130):"The [Williams] court wrote that the liberal construction provision was envisioned as obviating the need for wholesale textual revision of the myriad specific substantive provisions of the law.' As the court further explained,
" While the specific topical provisions changed by the Restoration Act give unmistakable illustrations of the Council's focus on broadening coverage, section 8-130's specific construction provision required a "process of reflection and reconsideration" that was intended to allow independent development of the local law "in all its dimensions."'
"Thus, areas of law that have been settled by virtue of interpretations of federal or state law "will now be reopened for argument and analysis . . . . As such, advocates will be able to argue afresh (or for the first time) a wide range of issues under the City's Human Rights Law . . . ."' The Williams court found that the HRL's text and legislative history represent a legislative desire that the HRL meld the broadest vision of social justice with the strongest law enforcement deterrent'" (Committee Report at 11; see Williams, 61 AD3d at 74, 77 n 24, and 68).
Thus, courts must to play a highly active role in the development of the City HRL by interpreting all cases in a manner consistent with the goal of providing unparalleled strength in deterring and remedying discrimination. As the Court of Appeals ruled in Albunio (16 NY3d 472), one of the Committee Report cases, all the provisions of the City HRL must be construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible" (16 NY3d at 477-478).
B.
Our task in construing the term "marital status" is guided by the above-stated history. Levin v Yeshiva Univ. (96 NY2d 484 [2001]) relied in part on an interpretation of the New York State Human Rights Law and failed to engage in liberal construction analysis, let alone the enhanced liberal construction analysis intended by the comprehensive 1991 amendments to the City HRL (Local Law No. 39) (which were only brought to life in 2005, with the passage of the Restoration Act). Thus, Levin's interpretation of "marital status" cannot be sustained.
Indeed, Levin was cited in connection with the passage of the Restoration Act as illustrative of the cases that had " either failed to interpret the City Human Rights Law to fulfill its uniquely broad purposes, ignore [sic] the text of specific provisions of the law, or both'" (Williams, 61 AD3d at 67 [quoting from transcript of Council debate]). With the passage of the [*5]Restoration Act, Levin " and others like [it] will no longer hinder the vindication of our civil rights'" (id., quoting from debate transcript).
Plainly, the Council rejected the "plain and ordinary" meaning of "marital status" as set forth in Manhattan Pizza Hut (51 NY2d at 511-512) and consequently the distinction between marital status as such and marital status as a "disqualifying relationship."
"Marital status" may refer to whether an individual is married or not married. It may also refer to whether two individuals are married to each other or not married to each other. In instant case, it refers to the latter: the marital status of two people in relation to each other.
Enhanced liberal construction analysis is not only required to fulfill the intent of the City HRL but also aids in determining the "plain meaning" of the statutory language.
Encompassing the marital status of two people vis-a-vis one another within the meaning of the term "marital status" is, at minimum, a reasonable construction (see e.g. Smith v Fair Empl. & Hous. Commn., 12 Cal 4th 1143, 1155, 913 P2d 909, 915 [Cal 1996] cert denied 521 US 1129 [1977]] [According to "(t)he usual and ordinary meaning of the words marital status,' as applied to two prospective tenants, [the rule] is that a landlord may not ask them whether they are married or refuse to rent to them because they are, or are not"] [footnote omitted]). As the most plaintiff-friendly reasonable interpretation, it is the one that must be adopted (Albunio, 16 NY3d at 477-478).
It is also the interpretation that accords with the purposes of the City HRL and the best means of achieving those purposes. Looking to Williams for guidance, as required by Local Law 35, we find that Williams concluded that it was not appropriate to require sexual harassment to be "severe or pervasive" before it could be actionable under the City HRL, in contrast to federal and state human rights laws, because that would mean that discrimination was "allowed to play some significant role in the workplace" (61 AD3d at 76), and that state of affairs would run counter to the City HRL's mandate that discrimination be allowed to play no role.
Applying that reasoning to discrimination based on marital status, a narrow interpretation of "marital status" would allow a wide range of discriminatory conduct — including conduct arising out of assumptions based on stereotypes — to continue unabated. Only a broader interpretation of marital status will further the "play no role" standard.
Williams also reasoned that a broader liability standard (i.e., not excusing harassment that was less than "severe or pervasive") would maximize the deterrent effect of the law, a required consideration (id.). Indeed, this consideration, was reemphasized by Local Law 35, which provided that exemptions from and exceptions to the law shall be construed narrowly, did so "in order to maximize deterrence of discriminatory conduct" (Administrative Code § 8-130[b]). Similarly, interpreting "marital status" to include the marital status of two people in relation to one another will maximize deterrence of discrimination based on marital status.
It is important to think in terms of the City HRL's ultimate object. The goal of discrimination law is to move decision-makers away from using protected class status as a proxy for rules unrelated to such status by which determinations that could properly be made. For example, an employer can, within limits not relevant here, prohibit business-related communications between any of its employees and any employees of another employer in the same field. If marital status ever a was legitimate proxy for a rule for protecting company secrets,[FN3] it is not an acceptable proxy now given today's social reality, as reflected in a variety of [*6]intimate relationships, including those of unmarried couples. The broader interpretation of marital status that we adopt today, will encourage covered entities to think seriously about their substantive concerns and tailor their policies to those legitimate concerns and not implicate protected class status.
Finally, the testimony of the Anti-Discrimination Center of Metro New York, Inc. was described by a council member at the time of the consideration and passage of the Restoration Act as "an excellent guide to the intent and consequences" of the Restoration Act (Williams, 61 AD3d at 68 n 7 [quotation marks omitted])[FN4]. This testimony provides important confirmation that enhanced liberal interpretation was contemplated to yield the result that a couple's marital status in relation to one another should not be permitted to be a basis for action by a covered entity. The testimony expressly cited Levin, describing it as "the case that held that discrimination against unmarried couples somehow does not constitute intentional discrimination on the basis of marital status" (April 14, 2014 testimony of Anti-Discrimination Center at 1-2, available online at http://www.antibiaslaw.com/sites/default/files/all/CenterTestimony041405.pdf.) as a reason for amending the City HRL to insure its independent construction with a view toward how best to further the "especially broad purposes" of the law.C.
Defendants' reliance on the decision of the New York City Commission on Human Rights in Matter of Cerullo v Fricione, dated April 15, 2011 (OATH Index Nos. 1865/10 and 1866/10), adopting a pretrial decision dismissing marital status claims (the ALJ decision), is misplaced for a variety of reasons.
As a preliminary matter, the ALJ decision is not entitled to deference by courts. "[W]here the question is one of pure statutory reading and analysis, . . . there is little basis to rely on any special competence or expertise of the administrative agency," and "courts are free to ascertain the proper interpretation from the statutory language and legislative intent" (Matter of Smith v Donovan, 61 AD3d 505, 508-509 [1st Dept 2009] [internal quotation marks omitted], lv denied 13 MY2d 712 [2009]; see also Kurcsics v Merchants Mut. Ins. Co., 49 NY2d 451, 459 [1980]).
The ALJ's decision proceeds on the assumptions the employment context (as opposed to the housing context) was beyond the Council's contemplation and that the decision to add domestic partnership status as a protected class was specific to housing-based concerns arising from the Levin decision (ALJ decision at 6-7). In fact, "partnership status" was added to all the principal contexts of discrimination, including employment discrimination (see e.g. Administrative Code § 8-107[1][a]). Moreover, the Council cannot be assumed to be unaware that Levin cited a definition of marital status that was first articulated in an employment discrimination context (Levin, 96 NY2d at 490).
To the extent that Cerullo is premised on the fact that an early version of the Restoration Act had made specific provision for the expansion of marital status coverage but not in the [*7]employment context [FN5] (ALJ decision at 6), it proceeds on faulty assumptions. That version had an anti-nepotism provision in the employment section of the law, further undercutting the argument that employment was beyond the Council's contemplation (see section 3 of the earlier version, proposing to add such a provision). The proposed anti-nepotism provision was mistakenly denominated as paragraph (g) of Administrative Code § 8-107. The denomination (g), however, only makes sense, given the structure of the City HRL at that time, as a proposed subparagraph under Administrative Code § 8-107(1), which addresses employment.
What Cerullo fails to note is that the Council explicitly chose another path for changing the definition of marital status. That is, it accepted the proposition that "[i]n respect to marital status, the addition of partnership status' is only an interim measure; the broader question will have to be revisited after the courts have re-examined their previous marital status rulings in light of each and all of the requirements of revised Section 8-130" (Anti-Discrimination Center testimony at 7). The testimony cited a 1977 New York City Human Rights Commission case that found that the City HRL was intended to deal with discrimination against unmarried couples (id. at n 11, citing Mandel v Reinhart, 1977 WL 52818, *7 (Comm on Human Rights, February 28, 1977]). Confirmation that the Council left the interpretation of "marital status" to the courts is found in the report of the Committee on General Welfare, which stated, "Pending judicial reconsideration of the proper scope of protection from discrimination based on marital status, this provision [partnership status] will ensure that" domestic partners are protected "from all forms of discrimination addressed by the human rights law" (Report of Comm on Gen Welfare, 2005, NY City Legis Ann at 536).
The reasons the Council did not add a marital status provision in 2005 are open to speculation. Perhaps some Council members were dissatisfied not with the proposed expansion but with the safe-harbor provision that went along with it (the proposed expansion for anti-nepotism policies that were not a "subterfuge to evade the purposes of this chapter" [early version of Restoration Act, supra at § 3). Even in 1980, the dissent in Manhattan Pizza Hut expressed concerns about the impact of anti-nepotism policies (51 NY2d at 515-517); social realities —- including the increasing presence in society of unmarried couples —- had already changed significantly in the 25 years between that decision and the passage of the Restoration Act in 2005.
What there cannot be speculation about is these facts: (a) the Council, in leaving the parameters of "marital status" to the courts, could have narrowed the courts' mandate in one or more ways but did not; (b) the overall mandate to construe the City HRL to achieve its uniquely broad purposes was put in place for all issues, as reaffirmed by Local Law 35; (c) the liberal construction provision was envisioned as "obviating the need for wholesale textual revision of the myriad specific substantive provisions of the law" (Williams, 61 AD3d at 74); (d) the narrow definition in Levin (96 NY&commat;D at 490) of marital status for City HRL purposes was legislatively overruled; (e) providing City HRL protection for couples on the basis of whether or not they are married to one another involves an entirely plausible interpretation of "marital status"; and (f) encompassing "couples' protection" within the proscription against discrimination on the basis of marital status is the best way to achieve broad coverage of the City Law in accordance with the [*8]stated goal of the Council to "meld the broadest vision of social justice with the strongest law enforcement deterrent" (Committee Report at 11; see Williams, 61 AD3d at 68 [internal quotation marks omitted]).
As for exceptions to the rule of protecting couples regardless of their marital status in relation to one another, this Court recognizes that there are legislative arguments both for and against (depending on the exception, the context of the discrimination, and the availability of alternatives that are not based on protected class). But especially considering Local Law 35's addition of a provision insisting on narrow construction of exceptions and exemptions (Administrative Code § 8-130(b), we leave it to the City Council to enact such exceptions or exemptions, if any, as it deems necessary.
Accordingly, the order of the Supreme Court, New York County (Arlene P. Bluth, J.), entered August 8, 2017, which, insofar as appealed from as limited by the briefs, denied defendants' motion to dismiss the complaint, should be affirmed, with costs.
Order Supreme Court, New York County (Arlene P. Bluth, J.), entered August 8, 2017, affirmed, with costs.
Opinion by Acosta, P.J. All concur.
Acosta, P.J., Tom, Oing, Moulton, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: SEPTEMBER 6, 2018
CLERK



Footnotes

Footnote 1: Based on the allegations, it appears that plaintiff and Wakefield were divorced but continued to live together and to be perceived by Fidessa as being married to one another.

Footnote 2: The Committee Report is available online at http://legistar.council.nyc.gov/View.ashx?M=F & ID=4293011 & GUID=39C1DD6F-B6FD-41C1-9711-60A3E6F9F2E6.

Footnote 3: The record at this stage does not reveal the nature of Fidessa's concern about marital status.

Footnote 4: The Center's executive director, one of the principal authors of the Restoration Act (id. at 68 n 6), was the author of A Return to Eyes on the Prize: Litigating Under the Restored New York City Human Rights Law, 33 Fordham Urb LJ 255 (2006).

Footnote 5: That version, Intro "22" as opposed to Intro "22-A" may be found online at http://legistar.council.nyc.gov/LegislationDetail.aspx?ID=441304 & GUID=79DC9B4A-845F-4BDA-AA6C-D6F63F0C8A0B & Options=ID%7cText%7c & Search=0022 (the earlier version is accessed in the "version" dropdown at "*" not "A."